E. B. POLAKIS AND YOULA POLAKIS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 34557-84.      Filed September 21, 1988.

---

*Alfred R. Westfall* and *Gregory A. Wedner,* for the petitioners.

*Irvin W. Fegley,* for the respondent.

NIMS, *Chief Judge:* By a notice of deficiency dated July 25, 1984, respondent determined deficiencies in petitioners' Federal income tax in the amounts of $21,342 for the taxable year ended December 31, 1981, and $9,388 for the taxable year ended December 31, 1982. After petitioners conceded respondent's adjustment to travel expenses deducted on their Schedule C for 1981, the sole issue for decision is whether interest paid by petitioners constituted "investment interest," the deductibility of which is limited under section 163(d).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are so found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

Petitioners Dr. E. B. and Youla Polakis resided in Modesto, California, at the time they filed their petition. During the years at issue, Dr. Polakis engaged in the trade or business of providing medical services as a sole proprietor in Modesto. As a successful surgeon specializing in general vascular surgery, Dr. Polakis spent full days and sometimes evenings servicing a medical practice which included regular if not daily surgery. Dr. Polakis also owned several rental properties. Separate sets of books and records were kept for each rental property. Petitioners maintained two business bank accounts: one for the medical practice and the other for the rental properties. No separate books, records, or bank accounts were maintained by petitioners with respect to the property in question.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

## *The Mable Avenue Property*

The interest expense that is at issue in this dispute arose out of the acquisition by petitioners of a parcel of undeveloped land commonly known as 2421 Mable Avenue (Mable Property). During November 1979, Angelo Pierrini, a real estate agent through whom petitioners had previously purchased real property,[2] approached Dr. Polakis and showed him the Mable Property. This 39.57 acre parcel of undeveloped land was located in an unincorporated area of the County of Stanislaus on the outskirts of the city of Modesto. In May 1980, petitioners purchased the Mable Property for a total purchase price of $640,000, consisting of a $50,000 downpayment and the execution of a $590,000 promissory note bearing a 10-percent annual interest rate on the outstanding balance. Under the terms of the promissory note, interest only payments were required during the first 5 years with principal and interest payments commencing thereafter. Petitioners' purchase of the Mable Property was not conditioned upon successful subdivision or annexation of the property.

At the time of purchase, the Mable Property was zoned A2-10, a designation which limits use to agricultural activities and the minimum parcel size to 10 acres. In addition to its exclusive agricultural zoning, the Mable Property was located within an "urban transition" zone created by the Stanislaus County General Plan.[3] The Mable Property was similarly designated as "urban reserve" property by Modesto, a designation which indicated Modesto's expectation that development and annexation would ultimately occur. Consistent with the property's A2-10 zoning designation, petitioners used or leased the land for use in farming and other agricultural activities.

After purchasing the property, Dr. Polakis, who personally lacked technical expertise in the development of property, began to investigate whether the Mable Property

---

[2]The record is silent as to petitioners' use of the property previously acquired through Pierrini.

[3]Expert testimony described "urban transition" as a Stanislaus County General Plan designation which recognizes that certain unincorporated property falls within the "sphere of influence" of a city or special district and that there is a reasonable expectation that it will be urbanized at some point in the future. Land falling within this designation is zoned for agricultural uses until annexation occurs.

could be developed. In this regard, he informally contacted William Malis (Malis), who has a background in law and investing, regarding the general subdivision, development and sale of real estate. Malis was not formally retained or paid for his opinions. Dr. Polakis also informally contacted Lee Watkins (Watkins), a friend and officer of Security Pacific Bank, regarding the financing to develop a similar sized piece of property. However, no formal application for financing of the Mable Property was made. Dr. Polakis also hired Manuel Katotakis (Katotakis) to be an "agent, prime contractor, and liaison for the development of the property." While no written contract existed between Dr. Polakis and Katotakis, Katotakis anticipated being paid for his investigative efforts through fees charged for designing and contracting the expected development of the Mable Property.

Acting in his role as agent, Katotakis contacted several members of the Modesto City Planning Commission. From these Planning Commission members Katotakis obtained a copy of an applicable environmental impact report and determined what some of the technical requirements for development of the property would be: the minimum or maximum number of lots per acre, the width of streets, the kinds of utilities and underground storm drainage required, and the sewer access points. He did not, however, meaningfully pursue the administrative and legislative aspects of annexing the property, but gathered information pertaining to development following annexation. Katotakis failed to investigate what requirements the Stanislaus County would have for developing the Mable Property. He maintained no books or records of his investigative activities.

The commercial or residential development of the Mable Property was ultimately conditioned upon changing the property's exclusive agricultural zoning designation. Such a change in zoning would occur automatically upon annexation of the property by the city of Modesto. Alternatively, the landowner could petition for an amendment to the Stanislaus County General Plan and zoning designation. Dr. Polakis did not seek to amend the county plan and zoning designations to allow development of the unincorporated land. Rather, he planned to develop the Mable Property

only after sewer lines were extended to the property and it was annexed by Modesto.

During the years petitioners owned the Mable Property, unincorporated Stanislaus County property could not be annexed unless, inter alia, the property was contiguous with the Modesto city limits[4] and had access to sewer and other city services. At the time the Mable Property was purchased, a sewer trunk line was not available to the property. Extension of the sewer trunk known as Sonoma was necessary to provide sewer service to the Mable Property and thereby qualify the property for annexation.

In 1979, prior to petitioners' purchase of the Mable Property, the city of Modesto voters adopted a growth management ordinance generally referred to as "Measure A" to control the extension of existing sewer trunks.[5] Pursuant to this ordinance, no sewer trunk extension could be approved by the Modesto city council without first receiving the advisory vote of the city's residents. While this advisory vote would not bind the city council, it was expected that the council would follow the advisory vote.

An administrative procedure was available for an interested party to initiate an advisory vote for a sewer trunk line extension. Under this procedure, a landowner could make a written request to the city council to extend sewer trunk lines. Alternatively, the landowner could request the sewer trunk extension at the city council's public projects committee meetings. These meetings were well publicized within the community. Records of both written requests and requests made at the public hearings were maintained by the city of Modesto. City records failed to disclose any formal request to initiate the extension of a sewer trunk line to service the Mable Property.

---

[4]While the record is not clear, it appears that noncontiguous land parcels could be annexed if two or more adjoining parcels were to be simultaneously annexed at a time when one parcel was contiguous with the city limits. Therefore, while the Mable Property was not contiguous to the Modesto city limits during petitioners' ownership, annexation was still possible.

[5]The growth management ordinance provided:

MODESTO CITIZENS ADVISORY GROWTH MANAGEMENT ACT

THE PEOPLE OF THE CITY OF MODESTO DO ORDAIN AS FOLLOWS: The City Council of the City of Modesto shall not approve, authorize, or appropriate funds for the extension of any sewer trunk without first holding an advisory election as provided by Section 5353 of the California Elections Code. For the purposes of this ordinance, the word "extension" shall mean the addition of sewer trunk capacity to permit expansion of urban development into the Urban Reserve area of the General Plan so as to require amendment of the General Plan * * *

Sometime during late 1981 or early 1982, petitioners and other landowners became concerned that the zero or slow growth policy encouraged by Measure A and supported by Modesto Mayor Peggy Mensinger would block extensions of sewer trunks to their properties and delay annexation and development activities. Petitioners and other landowners formed a citizens group. Each landowner contributed $1,500 to hire Larry Martin (Martin), an attorney and lobbyist, to promote the general interests of the group to the city council and other interested parties. Martin attended most of the public projects committee meetings, but did not specifically lobby for the extension of sewer trunks to the Mable Property.

On August 30, 1982, petitioners applied for property tax relief under the California Land Conservation Act of 1965, sometimes referred to as the Williamson Act.[6] Under the provisions of the Williamson Act, petitioners contracted with the County of Stanislaus to dedicate the Mable Property exclusively to agricultural uses for at least 10 years. In return for this land-use restriction, petitioners received an assessment revaluation of the Mable Property based on the property's agricultural value. This reduced assessment lowered petitioners' annual property taxes from approximately $7,000 to approximately $750.

Petitioners filed their 1981 and 1982 Federal income tax returns as married filing jointly. On the Schedule C (pertaining to the medical practice) of the 1981 return, petitioners claimed a $59,000 deduction for the interest paid on the promissory note used to purchase the Mable Property. A similar interest deduction of $54,000 was claimed by petitioners on Schedule E of their 1982 return.

Respondent determined that the Mable Property was held for investment and, accordingly, that the 1981 and 1982 deductions of interest paid to purchase the property were subject to limitation under section 163(d).

During 1985, petitioners concluded that the property was not developable and allowed the property to be foreclosed.

[6] Cal. Govt. Code sec. 51200 et seq. (West 1983).

## OPINION

Petitioners acquired the undeveloped parcel of unincorporated land known as the Mable Property by executing a promissory note in partial consideration. Shortly after purchase, they began to investigate the parcel's development potential. Lacking technical expertise in developing property and being engaged full-time in an unrelated trade or business, petitioners hired agents to represent them. The investigation continued for approximately 2 years, whereupon petitioners concluded that the political climate was not conducive to development. Petitioners then dedicated the property to exclusive agricultural uses in return for a substantial property tax reduction. Approximately 3 years later, petitioners abandoned their interest in the Mable Property.

The sole issue before us for decision is whether interest paid by petitioners in 1981 and 1982, on a promissory note incurred in the purchase of the Mable Property, constituted "investment interest" within the meaning of section 163(d).[7] Petitioners contend that because they purchased and maintained the Mable Property with the intent to develop and resell, the Mable Property was not held for investment purposes, and that the related interest deductions should be allowed without limitation. Conversely, respondent contends that because petitioners were not engaged in the trade or business of developing real estate and did not use the property in a trade or business, the property is a capital asset in their hands and necessarily held for investment.

---

[7]Sec. 163(d) provided in pertinent part:

(1) IN GENERAL.—In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to—
  (A) $10,000 * * * , plus
  (B) the amount of the net investment income * * * plus the amount (if any) by which the deductions allowable under this section * * * and sections 162, 164(a)(1) or (2), or 212 attributable to property of the taxpayer subject to a net lease exceeds the rental income produced by such property for the taxable year.

     \*     \*     \*     \*     \*     \*     \*

(3) DEFINITIONS.—For purposes of this subsection—

     \*     \*     \*     \*     \*     \*     \*

(D) INVESTMENT INTEREST.—The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.

After reviewing all the circumstances as established by the testimony and exhibits, we conclude that petitioners were not in the business of developing real estate at the time they purchased the Mable Property, and that they purchased the property as an investment. We also hold that their post-purchase activities never rose to the level of engaging in a trade or business so as to transmute the Mable Property into property held other than as an investment. Accordingly, while we reject respondent's theory that capital assets are per se "held for investment," we agree with his determination that the Mable Property was "held for investment."

We note at the outset that petitioners bear the burden of proving by a preponderance of the evidence that the Mable Property was not held for investment within the meaning of section 163(d). Rule 142(a).

"Property held for investment" is not defined in section 163(d) or the regulations thereunder. Neither does the legislative history of section 163(d) articulate what characteristics "investment property" must have. The legislative history does, however, clearly delineate several categories of debt which are not subject to the section 163(d) limitation:

interest incurred on funds borrowed for other purposes such as a home mortgage, installment purchases, consumer goods, and personal or student loans would not be affected by the limitation. In addition, interest on funds borrowed in connection with a trade or business would not be affected by the limitation. [H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 246.]

Thus, in the words of one noted commentator, "sec. 163(d) does not apply, at one end of the spectrum, to interest paid to acquire property used in the taxpayer's trade or business, such as plant, equipment, and inventory; and, at the other end of the spectrum, it does not apply to property acquired for personal use, such as the family residence or automobile." See 2 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 31.3.5, at 31-58 (1981). Only property characterized as other than personal-use property or trade or business property can therefore be "held for investment" for purposes of section 163(d). Distinguishing property acquired for investment from property intended for use in a trade or business depends upon the presence or

lack of "substantial investment intent" in the acquisition or retention of the property. *Miller v. Commissioner*, 70 T.C. 448, 455 (1978).[8] The presence or lack of "substantial investment intent" is essentially a question of fact. *Miller v. Commissioner*, 70 T.C. at 455-456.

Petitioners contend that they lacked "substantial investment intent" because they purchased and maintained the property with an intent to subdivide, develop, and resell. In support of this contention, they refer us to our decision in *Morley v. Commissioner*, 87 T.C. 1206 (1986).

In *Morley*, a taxpayer, who for 12 years was actively engaged in the trade or business of selling real estate as a broker, entered into a contingent contract on September 17, 1973, for the purchase of approximately 180 acres of undeveloped property referred to as the Elm Farm. Under the terms of the contract, the taxpayer was allowed 60 days to determine if in his sole discretion the property was suitable for development. The taxpayer in *Morley*, however, did not intend to develop the property, but to promptly resell if the purchase was effected. This was the taxpayer's first attempt at purchasing and selling real estate for his own account. And while the taxpayer did not have a particular repurchaser in mind at the time he entered into the contingent contract, he began negotiating the resale of the Elm Farm during the 60-day option period allowed by the purchase contract. The purchase was completed in December 1973. The consideration given for the purchase of the Elm Farm included $600,000 cash, which the taxpayer borrowed from the United Virginia Bank, a $1,500,000 assumption of a deed of trust, and a $400,000 second trust deed. Negotiations for the resale of the Elm Farm continued from September 1973 to approximately February 1974,

---

[8]In *Miller v. Commissioner*, 70 T.C. 448 (1978), the taxpayer argued that because its purchase of stock was property held in the trade or business of banking under the presumed judicial exception of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), to sec. 1221, the stock was not held for investment, and the interest on the indebtedness incurred in making the stock acquisition should not be subject to sec. 163(d). In responding to the taxpayer's argument, we evaluated whether the stock purchased by the taxpayer was held as a capital asset. 70 T.C. at 455. In the context of the case, our finding that the stock was a capital asset was synonymous with whether it was held with investment intent for purposes of sec. 163(d). *King v. Commissioner*, 89 T.C. 445, 462 (1987). We have previously limited our capital asset analysis and holding in *Miller* to the factual situation involved therein. *King v. Commissioner, supra.* Nonetheless, the presence or lack of "substantial investment intent" continues to govern the application of sec. 163(d). See *Boseker v. Commissioner*, T.C. Memo. 1986-353.

when a severe recession in the real estate market made development unfeasible. All but 14 acres of the Elm Farm were subsequently foreclosed. The taxpayer, however, continued to make payments on the $600,000 bank loan during the years following the foreclosure of the property.

In determining that the interest paid on the bank loan was not subject to the section 163(d) limitation, we held that the taxpayer's activities with respect to the Elm Farm amounted to engaging in a trade or business, and as a consequence the interest in question was not "investment interest" within the meaning of section 163(d)(3)(D). *Morley v. Commissioner,* 87 T.C. at 1213.

Petitioners' successful reliance on *Morley* requires a determination that they engaged in the trade or business of subdividing, developing, and reselling property.[9] Contrary to petitioners' assertion, the mere fact that the property may have been acquired with the ultimate intention of reselling does not result in a determination that the property was held primarily for sale in the ordinary course of business. *Buono v. Commissioner,* 74 T.C. 187, 200 (1980), citing *Howell v. Commissioner,* 57 T.C. 546, 555 (1972). Neither are we compelled to determine that because the sale of successfully developed property may produce ordinary income, the owner of the land is engaged in a trade or business prior to development activities. See *Beck v. Commissioner,* 179 F.2d 688 (7th Cir. 1950), affg. a Memorandum Opinion of this Court. Rather, as the Supreme Court recently expressed in *Commissioner v. Groetzinger,* 480 U.S. 23 (1987), "We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." 107 S. Ct. at 987.

Determining whether a taxpayer's activities rise to a level which constitutes " 'carrying on a business' requires an examination of the facts in each case." *Higgins v. Commissioner,* 312 U.S. 212, 217 (1941). Among the tests that courts have come to rely on in divining the nature of the

---

[9]Petitioners have not asserted that the Mable Property was used in any trade or business, i.e., petitioners' medical practice or rental real estate activities, and we express no opinion on the validity of such an argument.

taxpayer's activities with respect to real estate are the following: the nature and purpose of the acquisition of the property and the duration of the ownership; the continuity of sales or sales-related activity over a period of time; the volume and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of sales when compared to other sources of taxpayer's income. *Hoover v. Commissioner*, 32 T.C. 618, 625 (1959). See *United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir. 1969). However, as we stated in *Thrift v. Commissioner*, 15 T.C. 366, 369 (1950), "No one of these tests can be regarded as determinative but the question must be viewed in the light of all pertinent factors and particularly the facts of the individual case."

It is well established that a person may be engaged in more than one occupation or business through the use of agents. *Achong v. Commissioner*, 246 F.2d 445, 447 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; *Sherman v. Commissioner*, 16 T.C. 332 (1951). Hence, Dr. Polakis' full-time practice of medicine does not prohibit him from establishing that he simultaneously engaged in the business of real estate development during the years at issue.

Dr. Polakis testified that he believed at the time he purchased the Mable Property that development would be possible within a 3-to-5 year period. He further testified that he knew that sewer system access, annexation, and zoning amendments were necessary steps to development of the property. Petitioners were, however, unable to corroborate that they investigated the development potential of the Mable Property with a disinterested party prior to purchase. No record exists of any prepurchase inquiry into such development factors as the feasibility of extending the sewer lines in light of the recently enacted local slow-growth ordinance, the engineering and technical requirements of subdivision, the prospects for amending zoning designations, or the financial requirements of developing the Mable Property. As no evidence was presented at trial to indicate that petitioners had previously participated in a real estate development project, and after consideration of the record

as a whole, we find that petitioners' activities were insufficiently regular and continuous to constitute engaging in a trade or business of developing real estate at the time of purchase. *Commissioner v. Groetzinger, supra.* Rather, we believe that petitioners purchased the Mable Property because they expected it to appreciate in the future as the eventual expansion of the sewer trunk made development feasible, an investment motive.

We next consider petitioners' assertion that the Mable Property was not held for investment following the initial acquisition. Shortly after purchasing the property, petitioners engaged Katotakis to "investigate" the development possibilities of the property. Katotakis limited his inquiries to the technical contracting requirements following extension of the sewer trunks to the Mable Property. However, neither Katotakis, petitioners, nor any other agent formally applied to extend the appropriate sewer trunk to the Mable Property, a condition precedent to annexation and development of the property within the city limits of Modesto. In this regard, we are unpersuaded that Martin, the lobbyist jointly hired by petitioners and other landowners, was charged with the specific responsibility of promoting the extension of a sewer trunk to the Mable Property. Moreover, no petition for amendment of the county plan and zoning designations covering the Mable Property was made. Thus, during the time petitioners held the property, they initiated no formal action to procure a zoning designation on the Mable Property that was compatible with development.

Sometime after the purchase of the property, Dr. Polakis testified that he inquired of Watkins and Malis concerning the potential cost of engineering fees, underground installations, and interest charges. He failed, however, to corroborate with records, letters, maps, etc., that Watkins or Malis ever specifically investigated the characteristics of the Mable Property. In fact, petitioners acknowledge on brief that Malis was unfamiliar with the situation in Modesto. Moreover, Dr. Polakis specifically testified that he was not pursuing a financial commitment when he contacted Watkins at Security Pacific Bank. We do not find Dr. Polakis' casual inquiries regarding financing and develop-

ment costs to be inconsistent with those of an investor, nor that they rise to the level of engaging in a trade or business. We similarly find petitioners' 10-year dedication of the Mable Property to agricultural uses under the Williamson Act to be fully consistent with the intent of an investor to reduce a property's carrying costs while waiting for capital appreciation.

Finally, we note that in contrast to petitioners' other real estate holdings, no separate books and records were maintained concerning the Mable Property. Neither did petitioners treat their activities with respect to the Mable Property on a separate Schedule C. *Purvis v. Commissioner,* 530 F.2d 1332 (9th Cir. 1976), affg. a Memorandum Opinion of this Court. After sifting through the testimony of Dr. Polakis and other witnesses and examining the exhibits introduced as evidence, we conclude that the development activities of petitioners never rose to the level of engaging in a trade or business during the years at issue. Consequently, we distinguish our decision in *Morley* from this case and find that the Mable Property was acquired and held for investment. In reaching this conclusion, we have also considered the other cases cited by petitioners, but find them unpersuasive because they involve taxpayers whose activities were sufficiently regular and continuous to constitute engaging in a trade or business.

As we have determined that petitioners acquired and held the property with an investment motive, we need not decide the question of whether assets not acquired and held for use or sale in a trade or business or for personal use may be held with other than investment intent. We do, however, affirm our rejection of respondent's contention that all capital assets are per se held for investment. As discussed above, the legislative intent of section 163(d) clearly contemplates the exclusion of such capital assets as consumer goods and personal residences. *King v. Commissioner,* 89 T.C. 445, 462-463 n. 11 (1987). Moreover, the parenthetical language of section 1221, "(whether or not connected with his trade or business)," clearly contemplates the possibility of a capital asset being acquired for a business as contrasted with an investment purpose. See *Arkansas Best Corp. v. Commissioner,* 485 U.S. ____ , n. 7 (1988).

Accordingly, we affirm respondent's determination that the interest on the indebtedness incurred in the acquisition of the Mable Property is subject to the section 163(d) limitation for the 1981 and 1982 taxable years.

To reflect the foregoing,

*Decision will be entered for the respondent.*

