PAUL D. and PAMELA K. OLSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Olson v. Commissioner
Docket No. 6860-86.
United States Tax Court
T.C. Memo 1989-564; 1989 Tax Ct. Memo LEXIS 577; 58 T.C.M. (CCH) 393; T.C.M. (RIA) 89564; October 19, 1989. Richard M. Kates, for the petitioners. Teri A. Frank, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In a timely statutory notice of deficiency, respondent determined the following deficiencies in petitioners' income taxes: Year
Deficiency
1976
$2,149
1977
7,037
1979
49,884
1980
66,335
1981
86,871
*578 Respondent also determined that the deficiencies were subject to the increased rate of interest on tax motivated transactions under section 6621(c), I.R.C. 1986. Following the trial, respondent conceded the section 6621(c) increased interest issue. The issues remaining for our consideration are: (1) Whether petitioner Paul D. Olson was in the trade or business of buying and selling banks, so that the section 163(d)[1] investment interest limit would not apply to the interest on loans used to purchase bank stock; and (2) whether petitioners recognized ordinary income or capital gain when they sold some of the bank stock. FINDINGS OF FACT Petitioners resided in Boca Raton, Florida, when their petition was filed in this case. The parties stipulated facts, along with exhibits, all of which are incorporated by this reference. Paul D. Olson (petitioner) attended the University of Wisconsin and received a bachelor of business administration degree in finance. *579 After graduation, he was employed by the First Wisconsin National Bank in Milwaukee. Following his training period, he worked in the retail banking department in bank branch management and credit lending, and finally became vice president in charge of a subsidiary of the bank's holding company. In 1974, he commenced employment with the Central National Bank of Chicago (Central National). Central National was the sixth or seventh largest bank in Chicago with almost $1 billion in assets. He started as assistant vice president of the correspondent banking division, which, among other things, analyzed bank stock loans for the purpose of lending money to individuals to buy banks. Eventually, he became senior vice president and chairman of the management committee, reporting directly to the chairman of the board. In 1977 Central National fired petitioner when he aligned himself with the losing group in a dispute between factions of management and ownership. While at Central National, petitioner attended a part-time program at the Stonier Graduate School of Banking, affiliated with Rutgers University and run by the American Bankers Association. He finished the program after Central *580 National terminated him, and later became a regent of the school. Petitioner also represented the private sector for the Institute of Community Bankers, a program under the Comptroller of the Currency that included a representative of the Federal Deposit Insurance Corporation. Petitioner taught classes in evaluating the worth in connection with acquisition and resale of banks. After he was fired, petitioner wished to stay in the Chicago area but he was unable to find a suitable position. At that point, petitioner and two other individuals, Harold Ticktin and William Powers (group), began to purchase, as a group, bank stocks. As a general matter, petitioner always borrowed all or most of the funds to finance the bank stock purchases. In addition, petitioner always became president of the banks the group purchased after varying periods of time. He was also a member of the various boards of directors. Orland Park
The first financial institution the group purchased was the First Savings and Loan Association of Orland Park (Orland Park) in 1977. The group purchased a majority of the stock in Orland Park, financing most of it with a loan. Although petitioner was not initially *581 liable for the loan, he ultimately became liable. Orland Park had recently moved from the city of Chicago to a suburb. Road construction in front of the new location prevented access. At the time of purchase, Orland Park was losing money due to the construction and moving expenses. The group immediately closed an unprofitable subsidiary. In addition, Orland Park started "packaging" Federal National Mortgage Association (Fannie Mae) and Government National Mortgage Association (Ginnie Mae) loans. Because there was a need for mortgage money in the Orland Park suburb, Orland Park could sell the federally guaranteed loans to other banks with excess loan funds in the surrounding areas. This allowed Orland Park to make unlimited numbers of loans with little capital, and earn profits from points for loan packaging and profits from the interest rate spread on the sale of the Government-guaranteed portion of the loans. Petitioner was president of Orland Park from some time in early 1978 until February of 1981. Petitioner sold the Orland Park stock in February 1981 and recognized a loss. This loss was reported on Schedule C of his 1981 income tax return, combined with the gain from *582 the sale of another bank (Glendale). Glendale
The second financial institution the group eventually controlled was the First Security Bank of Glendale Heights (Glendale). The group initially purchased, in May of 1978, approximately 29 to 30 percent of Glendale's outstanding stock. The remainder was held by hundreds of other shareholders. The group eventually held over 50 percent of the outstanding stock by the middle of 1980. Prior to the group's purchase, the founders, who owned 5 or 6 percent of the stock, controlled Glendale. The founders contracted with related corporations to do Glendale's data processing. The related corporations charged exorbitant fees, cutting into Glendale's profits. In addition to eliminating the high fees, the group planned to organize a holding company to own the bank. If the holding company owned 80 percent or more of the bank stock, it could file consolidated income tax returns with the bank. The holding company could then offset bank profits against interest on the loans it would incur (or assume from the purchasers) in purchasing the bank. This would make the bank more marketable. The holding company could also own other subsidiaries *583 in businesses less regulated than banking, also enhancing marketability. The group was not, however, able to obtain 80 percent of Glendale's stock. Petitioner contracted to sell his Glendale stock in July 1981 and the sale closed on December 31, 1981. Petitioner reported a gain on the sale of his Glendale stock on Schedule C of his 1981 return, combined with the loss from the sale of the Orland Park stock. Sometime in 1980, petitioner became president of Glendale and remained in that position apparently until he sold his holdings. Maywood
The third bank in which the group acquired a controlling stock interest was the First National Bank of Maywood (Maywood). This bank was located in a deteriorating neighborhood. The group acquired an interest in First Maywood, Inc., in December 1978 and the corporation redeemed out the other shareholders, leaving the group with a controlling interest. From early 1977 to mid-1978, Maywood reorganized so that a holding company, First Maywood, Inc. (also Maywood), held all the First National Bank of Maywood's stock. In addition, the bank took funds from the Maywood community and invested in bonds, rather than in commercial lending that would *584 generate a better return. Petitioner became president of Maywood in late 1979 or early 1980. The group changed the bank's name to First Suburban National Bank in October 1980 to avoid any stigma attached to the Maywood neighborhood. They also opened a branch office in the more affluent Broadview neighborhood to broaden the customer base. In March 1981, petitioner enlisted the aid of Delta Properties to sell the Maywood bank. Apparently, the group could find no buyers. Petitioner's Maywood stock was foreclosed in April 1983. Elgin
The fourth bank in which the group acquired control was the Elgin National Bank (Elgin). The city of Elgin had been depressed since the Elgin watch company had moved out of the city. In addition, the Elgin bank itself had few ties to the local community. Petitioner believed there was a market in Elgin for Small Business Administration loans, and that Elgin could increase its return by selling the Government-guaranteed portion of such loans. The group acquired a controlling interest in Elgin in March 1979. The group brought in William O'Rourke (O'Rourke), a local individual with community ties, to be president of Elgin. In addition, Elgin *585 applied to the Federal Reserve Board for approval to form a holding company. Due to capital reserve problems, Elgin withdrew its holding company application. In addition, the group removed O'Rourke as president in late 1980 and replaced him with petitioner. Petitioner and O'Rourke received at least two letters from the Federal Reserve Bank of Chicago (Board) regarding the proposed holding company reorganization. In an August 21, 1980, letter, the Board asked petitioner to describe any corrective action taken to comply with the Board's policy concerning fees to insiders, including, ostensibly, petitioner, and a description of petitioner's duties as vice chairman of the board to substantiate his salary. The Board also asked for information regarding deficiencies and legal violations in operating two other banks petitioner was involved with, one of which was Maywood. A January 9, 1981, letter advised that the normal approval process, under which holding company approval would be deemed granted 45 days after the Board's acceptance of the application, would not apply. The normal procedure would not be in effect because of (1) the overall financial condition of the bank and other *586 banks in which the bank's principals were associated; (2) the bank's inability to meet the proposed debt servicing requirements; and (3) the combined debt-equity ratio of Elgin and Maywood. The balance on the Elgin loan was $2,288,700 as of May 31, 1979. This was split four ways between petitioner, O'Rourke, Powers, and Ticktin. The interest rate was variable. As of May 31, 1979, it was approximately 11.8 percent. The principal balance subsequently increased to $2,927,406.50. The interest rate increased to between 20 and 21 percent in 1981. The group also enlisted Delta's aid in 1981 to sell Elgin. Delta's efforts, however, were also unsuccessful and petitioner's Elgin stock was foreclosed in April 1983. Petitioner received $39,375 from Elgin as salary or fees in 1980. Petitioner received $24,375 as salary from Elgin in 1981. Manning
Petitioner also purchased stock in another financial institution, Manning Savings and Loan Association (Manning). The Manning stock was held solely for investment purposes. Petitioner borrowed $310,000 in 1978 to purchase the Manning stock. The principal balance on this loan as of November 30, 1978, was $302,250, and the interest *587 rate was 12 percent. The balance as of May 28, 1979, was $286,750, and the interest rate was 12-1/4 percent. The balance as of August 28, 1979, and November 28, 1979, was $279,000, and the interest rate was 12-1/2 percent and 16 percent, respectively. Petitioner paid the entire outstanding balance on December 31, 1981. Income and Expenses/Income Tax Returns
Petitioners reported the following dividend income on their income tax return for 1979: Butcher & Singer -- Nominee
$119
Kerr Glass
55
First Wisconsin
80
First Security
2,203
Elgin National
17,574
During 1979, petitioners paid $218,427 interest on indebtedness used to purchase or carry various bank stock holdings. Petitioners claimed a deduction for this amount on a Schedule C attached to their 1979 return. This amount included interest on the loan used to purchase the Manning stock. Petitioner listed his business as a bank operations manager and consultant. In addition to the interest expense, petitioners reported $163,966 gross receipts from the bank business, including $119,257 wage and salary income from the various financial institutions. Petitioners also claimed a telephone expense *588 of $1,080. Petitioners carried back the net operating loss from the bank business to their 1976 and 1977 taxable years and claimed and received refunds. Petitioners reported the following dividend income on their income tax return for 1980: Elgin National Bank
$19,881
First Wisconsin Corp
80
First Security Bank
3,536
Manning Savings & Loan
103,864
Petitioners also reported a $42,494 net long-term capital gain on the sale of 3,463 shares of Manning stock. During 1980, petitioners paid $250,408 interest on indebtedness used to purchase or carry various bank stock holdings. Petitioners claimed a deduction for this amount on a Schedule C attached to their 1980 return. This amount included interest on the loan used to purchase the Manning stock. Petitioner listed this business as bank operations. In addition to the interest expense, petitioners reported $191,248 gross receipts consisting of wage, salary, fee, and bonus income from various financial institutions. Petitioners also claimed a telephone expense of $1,272. On their income tax return for 1981, petitioners reported $85 in dividends from First Wisconsin. Petitioners reported $45,288 in dividends *589 from Elgin on the "bank operations" Schedule C of their 1981 return. They also reported a $42,932 net long-term capital gain from the sale of 3,417 shares of Manning stock. During 1981, petitioners paid $305,951 interest on indebtedness used to purchase or carry various bank stock holdings. Petitioners claimed a deduction for this amount on a Schedule C attached to their 1981 return, listing the business as bank operations. This amount included interest on the loan used to purchase the Manning stock. In addition to the interest expense, petitioners reported $939,124 gross receipts, including $171,638 salary, fee, and dividend income from various financial institutions. The balance of gross receipts, $767,486, consisted of the gross sale proceeds from the stock sales in Orland Park and Glendale. The net gain on the two sales equaled $122,000. Petitioners also claimed a telephone expense of $1,180. OPINION Section 163 allows a deduction for interest paid on indebtedness. Concerning the taxable years in issue, there is a limit on the investment interest deduction up to the amount of *590 investment income plus $10,000. Sec. 163(d)(1). Investment interest means interest paid or incurred on indebtedness used to purchase or carry property held for investment. Sec. 163(d)(3)(D). The major issue for our consideration is whether the bank stock is property held for investment or whether it was held primarily for sale to customers (inventory). If the stock is held for investment, then petitioner cannot deduct interest on bank loans used to purchase the stock in excess of $10,000 in excess of investment income. If the stock was petitioner's inventory or held primarily for sale to customers, then the entire interest deduction would be deductible. Additionally, we must characterize the gain on the sale of Glendale and Orland Park as ordinary or capital. Sec. 1221. Funds borrowed in connection with a trade or business of the taxpayer are not affected by the investment interest limitation. H. Rept. No. 91-413 (Part I) (1969), 1969-3 C.B. 200, 246; Polakis v. Commissioner,91 T.C. 660 (1988). Petitioner contends he was in the trade or business of *591 buying banks, "fixing them up," and quickly reselling them. Respondent argues that petitioner was not in such a business and that the bank stock was, therefore, property held for investment. The determinative question in the investment/trade or business dichotomy is whether the taxpayer held the property with a "substantial investment intent." Polakis v. Commissioner,supra;Miller v. Commissioner,70 T.C. 448 (1978). The presence or absence of substantial investment intent is a question of fact. Miller v. Commissioner,supra.
Petitioner must clear several hurdles to succeed in this case. First, he must have been engaged in a trade or business, and we must determine which particular trade or business that was. Next, he must establish that the bank stock was connected with that trade or business. Finally, he must prove that he did not have the prohibited "substantial investment intent." Initially, after considering all the evidence in the record, we find that petitioner was not in the trade or business of buying and selling *592 banks. We have reached this conclusion, in part, because of our finding that petitioner's motive for purchasing the bank stocks related to his position as a bank executive. In 1977, petitioner lost his position with Central National and could not find a "suitable" position. Then, with two other persons, he purchased controlling interests in 4 banks over a period of approximately 4 years. He immediately started receiving, or perhaps more appropriately, caused the banks to pay him consulting fees, salaries, and bonuses ranging between $150,000 and $200,000 per year. Petitioner in all relevant transactions managed to become president of each bank after varying periods of time. We find that petitioner purchased the bank stock with the motive and intention of installing himself as an officer or director to receive a large salary and fee income. The formation of a holding company further comports with this conclusion. The group had to borrow considerable amounts of money to make the acquisitions and, consequently, would have to pay considerable amounts of interest. By transferring the acquisition debt along with the bank stock to the holding company, the bank could pay interest *593 (and principal) instead of petitioner, a sort of leveraged buy-out. With respect to Maywood, the holding company actually borrowed money and redeemed out the other shareholders. This is consistent with our finding that petitioner bought the banks to become an officer and director. Other facts support our finding that petitioner was not in the trade or business of buying and selling banks. "[T]o qualify such activities as a separate business they must be conducted for a fee or commission or with the immediate purpose of selling the corporations at a profit in the ordinary course of that business." (Emphasis added.) Deely v. Commissioner,73 T.C. 1081, 1093 (1980). In an inventory-type business, the major source of income would be the spread between cost and sale price. By paying out large salaries, fees, and bonuses, petitioner lessened the resale value of the banks. Petitioner appeared to be more interested in the "fee or commission" than in "selling the corporations at a profit." This is borne out by the amounts earned in the "bank operations" business. Petitioner *594 netted only $122,000 from bank sales, while salaries and fees for 1979 through 1981 were over four times that amount. Further, even if we assume the "corrective" measures the group took would enhance profitability, those measures are just as consistent with prudent bank management as with an intent to quickly resell. We also doubt that petitioner had an "immediate" purpose of reselling. Petitioner did not list the banks with an agent until March 1981. In addition, while petitioner blames Federal regulatory lag for delay in putting the banks up for sale, we think this was more prudent regulatory investigation brought on by petitioner's own techniques. For example, the Federal Reserve Bank held up Elgin's holding company application due to questions about ability to service its debt and the financial condition of other banks petitioner was associated with. The Federal Reserve also questioned the propriety of the bank's insider fees and what duties petitioner performed to substantiate his salary. However, our finding that petitioner was not in the trade or business of buying and selling banks does not end the inquiry. Funds borrowed in connection with a trade or business of *595 the taxpayer are not affected by the section 163(d) limitation. We have previously found that petitioner acquired the stock in order to secure employment with the four banks. A corporate employee, including an officer or director, or a consultant, can be involved in a trade or business as such. Trent v. Commissioner,291 F.2d 669 (2d Cir. 1961). In this case, petitioner purchased the bank stock predominantly to further his trade or business as a bank executive. In the context of section 163(d), even if the stock is a capital asset, that does not preclude a finding that petitioner acquired the stock in connection with his trade or business. King v. Commissioner,89 T.C. 445 (1987). Petitioner must finally prove that he did not have a "substantial investment intent" in purchasing the stock. Our finding that petitioner's predominant purpose was to provide himself employment does not rule out a secondary investment motive. Substantial does not mean premier or predominant; a secondary investment intent may still be substantial. Miller v. Commissioner,supra at 455; *596 W.W. Windle Co. v. Commissioner,supra.Both the original purpose of the acquisition and the reason for continued retention must be devoid of substantial investment intent. Miller v. Commissioner,supra;W.W. Windle Co. v. Commissioner,supra.
Distinctive to the process of investing is income, profit, or gain in the form of (1) enhancement of value in the investment, or (2) dividends. Whipple v. Commissioner,373 U.S. 193 (1963). We have previously found that petitioner's purpose in obtaining the stock was to secure his employment. We do not believe he intended to profit substantially from the increase in value of the bank stock. Petitioner purchased stock in four banks. He then commenced to withdraw large amounts of money from the banks in the form of fees and salary thereby decreasing the value of the stock. In fact, only one bank was sold at a profit. Of the remaining banks, one was sold at a loss, and the other two were foreclosed. Therefore, we find petitioner did not have substantial investment intent with regard to the first *597 component, enhancement of value. Petitioner received only small or nominal dividends with regard to three of the banks he purportedly purchased for resale. Therefore, we do not find a substantial investment intent with respect to Orland Park, Glendale, and Maywood. Elgin, however, declared and paid petitioner dividends of $17,574 in 1979, $19,881 in 1980, and $45,288 in 1981. These amounts are substantial both in an absolute sense and relative to the fees and salaries he received from Elgin in those years. We find the large amount of dividends indicates a substantial investment intent with respect to the Elgin stock. Particularly telling is the large amount of dividends paid in 1979, the year petitioner acquired the Elgin interest. Therefore, the section 163(d) limitation would apply to the Elgin indebtedness. Further, petitioner has not identified where on his tax returns he deducted the interest on the indebtedness used to purchase stock in Manning. Petitioner testified that the stock was held for investment. We conclude that this interest was incorrectly aggregated with his Schedule C "business" interest. We find the section 163(d) limitation would also apply to the *598 Manning indebtedness. Petitioner did not separately allocate the interest allocable to each debtor on the Schedule Cs of his returns. He also did not present such evidence at trial. However, we may estimate the Manning interest based on the promissory notes in the record. Further, there are a number of letters and interest statements for 1979 through 1981 with respect to Elgin to estimate the loan balance and interest rate. We estimate these amounts bearing heavily against petitioner, who has the burden of proof and whose inexactitude created the problem. 1979
1980
1981
Manning
$40,000
$ 45,000
$ 45,000
Elgin
52,000
100,000
150,000
Total Section 163(d) Interest
$92,000
$145,000
$195,000
The last issue is whether petitioner recognized ordinary income or capital gain when he disposed of the Orland Park and Glendale stocks in 1981. Capital assets include property held by the taxpayer (whether or not connected with his trade or business) except (1) stock in trade or inventory property or property held for sale in the ordinary course of the taxpayer's *599 business, and (2) property used in his trade or business subject to the allowance for depreciation or real property used in his trade or business (plus other exceptions not relevant here). Sec. 1221. We have already found that the bank stock was not petitioner's inventory or held for sale in petitioner's business. Further, the bank stock was not subject to wear and tear, exhaustion, or obsolescence. Finally, even though it was integrally connected to his business, it is outside the specifically defined statutory exceptions for capital assets. See Arkansas Best Corp. v. Commissioner,485 U.S. 212 (1988); Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). Therefore, the gain or loss on the sale of Glendale and Orland Park stock, respectively, was capital in nature, and would be eligible for the preferential treatment afforded net long-term capital gain. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩