T.C. Memo. 1997-486


UNITED STATES TAX COURT


JACK R. AND PATRICIA J. FINNEGAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6944-95.                    Filed October 28, 1997.


Jack R. Finnegan, pro se.

<u>Louis B. Jack</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a $10,801 deficiency in petitioners' 1991 Federal income tax.  The issue for decision is whether petitioners are entitled to deduct various costs

incurred in connection with their construction and attempted sale of a house under section 162.[1]

FINDINGS OF FACT

Oral stipulations were made at trial. The oral stipulation of facts and the referenced exhibits are incorporated herein by this reference. Petitioners, husband and wife, resided in Santa Ana, California, at the time they filed their petition.

During 1991, petitioner Jack R. Finnegan (Mr. Finnegan) was a construction consultant. Mr. Finnegan ran his construction consulting business out of his home in Santa Ana. As a construction consultant, Mr. Finnegan was hired by third parties: (1) To construct and estimate the cost of projects such as houses, banks, restaurants, schools, and hospitals; (2) to help put bids together; and (3) to act as an arbitrator, architect, quantity surveyor, developer, project manager, or general contractor. As a construction consultant, Mr. Finnegan was paid a fixed amount for each project. He was compensated regardless of whether the project was sold.

During 1991, in addition to his job as a construction consultant, Mr. Finnegan constructed a house located at 871 Avenida Acapulco in San Clemente, California (the Acapulco

---

[1] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

house).[2]  Mr. Finnegan was not compensated for his work on, nor hired by a third party to build, the Acapulco house.  Mr. Finnegan had a construction trailer, which he used as an office, parked at the Acapulco house.  Mr. Finnegan maintained a telephone line, water, electric, and other utilities at the Acapulco house.

Mr. Finnegan performed substantial amounts of work to construct the Acapulco house including, but not limited to: Laying and staking the building; making the exterior door frames, window frames, and arched brick work; manufacturing the round top, stained glass, and leaded glass windows; manufacturing and finishing the cathedral, coffered, inverted pyramidal, and beamed ceilings; and designing and installing a complete irrigation and drainage system.

Petitioners tried, but were unable, to sell the Acapulco house.  Mr. Finnegan was not a licensed real estate broker, and petitioners never listed the Acapulco house with a real estate broker or sales agent.  Instead, petitioners put a "for sale" sign in front of the house and ran a classified advertisement, starting in April 1991, in the Orange County Register.  As of the time of trial, the Acapulco house had not been sold.

---

[2]  During the last 20 years, Mr. Finnegan constructed only one other house for sale, which was sold in 1978 or 1979, where he was not acting as a construction consultant.

On August 16, 1992, petitioners timely filed their Federal income tax return for 1991 (the original return). On Schedule C of the original return, Mr. Finnegan listed his principal business or profession as "Construction Consultant". In addition to other income, petitioners reported $16,793.89 in gross receipts from the construction consulting business which consisted of payments from (1) Columbo Construction Co. for work on two elementary schools in Ridgecrest, California, and (2) Hil-Gan Development Corp. for repairing an apartment building in Tustin, California, completing a security gates contract, and managing the apartment building in Tustin, California. The original return showed a tax liability of $46,842.82. Petitioners paid this amount.

On January 3, 1994, petitioners filed an amended return for 1991 (the amended return) which showed a revised tax liability of $27,371.12 and sought a refund of $19,471.70. On Schedule C of the amended return, which listed Mr. Finnegan's principal business or profession as "Construction Consultant", petitioners claimed an additional $59,186.95 of expenses (the additional expenses).[3] Petitioners incurred all of the additional expenses

---

[3] These additional expenses are the result of petitioners' claiming new items or increasing the amount for items claimed on the original return. Respondent concedes that petitioners substantiated the following amounts:

(continued...)

in connection with their construction and attempted sale of the Acapulco house (the real estate activity).[4]

In April 1994, the Internal Revenue Service (IRS) assigned petitioners' refund claim to Office Auditor Monte Kruse (Mr. Kruse). On or about May 20, 1994, Mr. Kruse proposed a partial disallowance of the refund claim. On or about June 23, 1994, Mr. Kruse sent petitioners a Letter 905 (Formal Notice of Partial Claim Disallowance) which allowed $10,801 of the refund claim. Petitioners protested the proposed partial disallowance, and on June 30, 1994, the case was referred to the Appeals Office.

On July 5, 1994, $10,801 of the tax was abated. On or about July 25, 1994, the examination division notified petitioners that $10,801 would be refunded.

---

[3](...continued)

| Item | Amount |
|---|---|
| Advertising | $1,719.83 |
| Commissions and Fees | 125.00 |
| Repairs and Maintenance | 85.00 |
| Supplies | 4,405.99 |
| Utilities | 921.08 |
| Mortgage Interest | 49,860.47 |
| Total | 57,117.37 |

Petitioners concede any difference between the new or increased amounts and the amounts respondent concedes.

[4] We use the term "real estate activity" for convenience only.

On August 17, 1994, the Appeals Office referred the case back to the examination division.  The case was assigned to Revenue Agent Kurt Bensworth (Mr. Bensworth).  Sometime after September 28, 1994, Mr. Bensworth issued a report recommending full disallowance of the refund claim.  On April 24, 1995, the IRS mailed a notice of deficiency to petitioners asserting a deficiency of $10,801--the amount of the refund claim which was previously allowed and abated.

                              OPINION

Petitioners contend that the real estate activity was part of the construction consulting business or, alternatively, that it was a separate trade or business.  Respondent argues that the real estate activity was not part of petitioners' construction consulting business;[5] furthermore, respondent contends that the real estate activity was not itself a trade or business.  Therefore, according to respondent, section 162 does not support the deductibility of the additional expenses.  Respondent alternatively argues that if the real estate activity was part of petitioners' construction consulting business, or was itself a trade or business, then the additional expenses must be capitalized.

_____

[5] Respondent concedes that Mr. Finnegan was in the trade or business of being a construction consultant.

A.    Whether the Real Estate Activity Was Part of the
      Construction Consulting Business

Mr. Finnegan ran the construction consulting business out of his home in Santa Ana.  As a construction consultant, Mr. Finnegan worked for third parties; he was compensated regardless of whether the projects he constructed were sold.  There is no evidence that he was responsible for selling the projects he constructed.

Mr. Finnegan had a separate office and telephone line for the real estate activity at the Acapulco house in San Clemente. Mr. Finnegan was not hired by a third party to build the Acapulco house; his receipt of any money from his work on the Acapulco house was conditioned upon its sale; and petitioners were responsible for selling the Acapulco house.

After reviewing all the facts and circumstances, we find that the real estate activity was not part of petitioners' construction consulting business.  Petitioners, therefore, were not entitled to deduct the additional expenses as costs of the construction consulting business.

B.    Whether the Real Estate Activity Was a Separate Trade or
      Business

Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deductions claimed.  Rule 142(a); INDOPCO, Inc. v. Commissioner,

503 U.S. 79, 84 (1992).  Taxpayers are allowed a deduction for ordinary and necessary expenses paid or incurred in carrying on a trade or business.  Sec. 162(a).  The Supreme Court has stated that "to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.  A sporadic activity, a hobby, or an amusement diversion does not qualify."  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  Whether a taxpayer is in a trade or business requires an examination of the facts and circumstances of each case.  Higgins v. Commissioner, 312 U.S. 212, 217 (1941); see also Commissioner v. Groetzinger, supra at 36.  A taxpayer may engage in more than one trade or business at the same time.  Snyder v. Commissioner, 295 U.S. 134, 138-139 (1935); Gestrich v. Commissioner, 74 T.C. 525, 529 (1980), affd. without published opinion 681 F.2d 805 (3d Cir. 1982).

A taxpayer who engaged in only one venture can be found to be in a trade or business.  See Morley v. Commissioner, 87 T.C. 1206, 1211 (1986); S & H, Inc. v. Commissioner, 78 T.C. 234, 244 (1982).  These two cases, however, are distinguishable from the case at bar.

In S & H, Inc. v. Commissioner, supra, the taxpayer's primary business was acquiring improved real property and either

leasing or operating it. In 1968, the taxpayer acquired 300 acres of unimproved land (the Whiteside Farm) which he considered to be a good investment. In 1973, Griffin Grocery Co. (Griffin) approached the taxpayer about purchasing 10 acres of the Whiteside Farm. This transaction failed, but the taxpayer and Griffin agreed that the taxpayer would construct a warehouse on the Whiteside Farm, and Griffin would sublease the warehouse from the taxpayer for 20 years. Griffin had an option to purchase the land and warehouse after 15 years for a fee or after 20 years without payment merely by notifying the taxpayer of its election to exercise the option. The taxpayer stipulated that this sublease agreement was an installment sale of the warehouse and land to Griffin.

The Court, in holding that the taxpayer's activity constituted a trade or business, focused on the preexisting arrangement to sell/transfer the Whiteside Farm to a specific party who was committed to take it. S & H, Inc. v. Commissioner, supra at 244-245. The Court characterized this transaction as not being a "speculative venture". Id. at 245.

Mr. Finnegan's real estate activity, however, was a speculative venture, and there was no preexisting arrangement (nor any arrangement) for the transfer of the Acapulco house to

any specific party, let alone someone who was committed to pay for it.

In Morley v. Commissioner, supra, the taxpayer was in the trade or business of selling real estate for commission as a broker. In September 1973, the taxpayer entered a contract giving the taxpayer the right to purchase 180 acres of property (the Elm Farm). The taxpayer did not have a particular repurchaser in mind at the time he entered the contract but intended promptly to attempt to resell the Elm Farm if he purchased it. The taxpayer purchased the Elm Farm in December 1973. From September 1973 to February 1974, the taxpayer was negotiating the sale of the Elm Farm to a third party (Mr. Pflug). In February 1974, the real estate market collapsed, and Mr. Pflug and the taxpayer terminated negotiations. Because of the real estate market collapse, the taxpayer was unable to sell the Elm Farm to other purchasers although he attempted to do so.

The Court stated that a taxpayer engaged in a single venture can be found to be in a trade or business in "situations where, at the time the property was acquired by the taxpayer, he intended promptly to resell the property and the objective facts show that he proceeded to attempt to implement that intent". Morley v. Commissioner, supra at 1211. In finding that the taxpayer was engaged in a trade or business regarding his

activity involving the Elm Farm, the Court relied primarily upon the negotiations between the taxpayer and Mr. Pflug and secondarily on the fact that the taxpayer had no financial resources (because the taxpayer's net worth was tied up in nonliquid assets) which would allow him to cover the carrying charges on the Elm Farm.  Id. at 1212.

Unlike the taxpayer in Morley, Mr. Finnegan was not a real estate broker, and he never listed the Acapulco house with a broker or agent.  There were no negotiations with prospective purchasers for the sale of the Acapulco house near or after its completion, and Mr. Finnegan had significant financial resources.[6]  Petitioners also still owned the Acapulco house 5 years after construction was completed.  Mr. Finnegan did not meet his burden of proving that the real estate activity was a trade or business, and the objective facts do not support petitioners.

Furthermore, when evaluating whether a taxpayer's activities with respect to real estate amount to a trade or business, we consider "the nature and purpose of the acquisition of the property and the duration of the ownership; the continuity of

---

[6]  We note that petitioners listed their taxable income as being $183,056.50 on the original return and $113,539.71 on the amended return.  These totals were derived from their income from the construction consulting business, rental income, taxable interest income, tax-exempt interest income, dividend income, a director's fee, and income from a capital gain distribution.

sales or sales-related activity over a period of time; the volume and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of sales when compared to other sources of [the] taxpayer's income."  Polakis v. Commissioner, 91 T.C. 660, 670 (1988).  No one of these factors, however, is determinative. Id.

The factors set forth in Polakis weigh against Mr. Finnegan. As to the nature and purpose of the construction of the Acapulco house, a lack of business intent can be inferred from petitioners' ownership of the Acapulco house for more than 5 years after Mr. Finnegan completed construction.  Mr. Finnegan's sales were not continuous, frequent, or voluminous (he sold only one home during the last 20 years which he constructed).  Mr. Finnegan never hired a real estate agent or broker, and his efforts to sell the Acapulco house were limited to putting a "for sale" sign in front of the house and running a classified advertisement in a local newspaper.  Petitioners have not offered any credible explanation why the Acapulco house remained unsold at the time of trial (5 years after Mr. Finnegan completed its

construction).[7]  Finally, petitioners had no income from the real estate activity and substantial income from other sources.

After reviewing all the facts and circumstances, we hold that the real estate activity was not a trade or business.  Even though Mr. Finnegan devoted time and effort to the real estate activity, it was not regular and continuous.  By so holding, we need not decide whether the real estate activity was engaged in for profit.  Petitioners, therefore, were not entitled to deduct any of the additional expenses under section 162.  We note that in so holding we need not decide whether these amounts need to be capitalized.

In reaching all of our holdings herein, we have considered all arguments by the parties and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.

---

[7]  Mr. Finnegan claims that the real estate market hit hard times after he completed construction of the Acapulco house. There is no evidence, however, that the market remained poor for the entire 5 years after he completed construction.