T.C. Memo. 2018-6

UNITED STATES TAX COURT

BARRY G. CONNER AND BRIDGET H. CONNER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22941-15.                    Filed January 22, 2018.

<u>Charles E. Hodges II</u> and <u>Antoinette G. Ellison,</u> for petitioners.

<u>Brianna B. Taylor</u>, <u>John W. Sheffield III</u>, <u>Jason P. Oppenheim</u>, and

<u>Lawrence D. Sledz</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined deficiencies and penalties

with respect to petitioners' Federal income tax as follows:

[*2]

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2012 | $163,947 | $32,789 |
| 2013 | 681,668 | 136,334 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

After concessions the issues for consideration are: (1) whether the sale of Shoreline Drive, LLC's (Shoreline) real property resulted in an ordinary loss or a capital loss; (2) whether properties owned by Shoreline, West Ahaluna, LLC (West Ahaluna), Barry Conner, LLC (BC LLC), and Lumpkin Campground Road, LLC (Lumpkin), were held for investment such that deductions for the LLCs' expenses are limited under section 212 and section 163(d); (3) whether petitioners' losses for Shoreline, West Ahaluna, BC LLC, Lumpkin, and Gainesville Market, LLC (Gainseville Market), are limited by section 469; (4) whether petitioners are entitled to a net operating loss deduction of $581,741 for tax year 2012; (5) whether petitioners are entitled to a noncash charitable contribution deduction of $520,000 for tax year 2013; (6) whether petitioners are entitled to deduct a loss

**[*3]** from America's Home Place (AHP) for tax year 2012; and (7) whether

petitioners are liable for accuracy-related penalties under section 6662(a) for tax

years 2012 and 2013.[1]

FINDINGS OF FACT

Some of the facts are stipulated and are so found.[2] Petitioners resided in

Georgia when they timely filed their petition.

I.    <u>America's Home Place</u>

Petitioner husband was the founder, CEO, and sole shareholder of AHP, an

S corporation. AHP was a custom home builder operating throughout the eastern

United States. It built custom homes after a customer had selected a floor plan,

provided a lot, and qualified for a loan through third-party lenders. AHP did not

own the lots where the homes were built, and it did not maintain an inventory of

partially or totally completed homes.

During the tax years at issue, AHP's main source of revenue was from the

sale of custom homes. AHP owned large tracts of undeveloped land that it

---

[1]The parties agree that whether petitioners failed to include 2012 State tax refunds in their 2012 taxable income is computational.

[2]The ruling on the admission of Exhibit 13-P was reserved, and it is admitted.

**[*4]** purchased for speculative purposes. AHP does not hold the land as inventory, nor is the land used in AHP's business operations.

AHP owned building centers, sales centers, corporate offices, and model homes. These centers have extensive furnishing and real property improvements. During tax year 2013 AHP closed and renovated sales centers.

AHP had approximately 246 employees and 12 divisional presidents during the tax years at issue. AHP's employees oversaw the administrative functions of the several LLCs that petitioner husband owned.

## II. Petitioners' Real Estate Holdings

Petitioner husband was the sole member of several LLCs through which he acquired large tracts of undeveloped land before the tax years at issue. These entities were: (1) Shoreline; (2) West Ahaluna; (3) BC LLC; and (4) Lumpkin (collectively, Conner LLCs). The Conner LLCs still own properties except for Shoreline, which sold all of its properties in 2013. BC LLC and Lumpkin also owned rental properties. The Connor LLCs had no employees or management offices during the tax years at issue.

Gainesville Market held property for rental purposes during the tax years at issue. Petitioner wife initially owned a 10% interest in Gainesville Market, and she purchased an additional 75% in 2002. She purchased the remaining 15% in

[*5] 2004.  According to petitioners, petitioner wife transferred her interest to her husband, and petitioner husband was the only member of Gainesville Market during the tax years at issue.

For tax year 2013 petitioners filed an election to treat all interests in rental real estate as a single rental real estate activity pursuant to section 469(c)(7)(A). Each of the Conner LLCs and Gainesville Market were disregarded entities for Federal tax purposes.

A.    Shoreline

In 2005 petitioner husband formed Shoreline as a single-member LLC. Shoreline purchased 94.742 acres of undeveloped lakefront property in Hall County, Georgia, for $3,380,000.  Shoreline financed the purchase with a $2,197,000 loan from Wachovia Bank (Wachovia).  In June 2007 Shoreline purchased an additional two lots, which were adjacent to the land it had previously acquired, for $62,500.

Shoreline purchased the properties to develop a residential lakeside community.  Between 2005 and 2007 petitioner husband prepared design plans, obtained approval for a 94-lot subdivision from the local government, obtained approval of boat docks from the Army Corps of Engineers, and secured water availability for a sewage treatment system.  He hired a firm to help with the

[*6] drawing of design plans. Because of the unavailability of credit in 2008 and 2009, the development never progressed past the planning stages. Petitioner husband considered other design plans, including a 20-, 16-, or 6-lot residential community. In 2013 petitioner husband placed Shoreline's land in a conservation program to lower its property taxes. As part of the requirements for conservation use, he certified that business would not be conducted on the land.

In May 2013 petitioner husband sold Shoreline's land for $1,518,535 to an unrelated party. The land was not advertised for sale. This unrelated party approached petitioner husband about buying the land. At the time of sale Shoreline's land was still held in the conservation program.

Shoreline's 2013 Schedule C, Profit or Loss From Business, reported cost of good sold (COGS) of $3,511,168 and sales of $1,518,535 for a total loss of $1,992,633. Shoreline reported no income for tax year 2012. During the tax years at issue petitioners deducted the following expenses incurred by Shoreline and reported them on their Schedule C.

[*7]

| Expense | 2012 | 2013 |
|---------|------|------|
| Mortgage interest | $104,682 | $30,427 |
| Taxes and licenses | 19,997 | 24,835 |
| Other expenses | 60 | [1]5,047 |

[1]Shoreline incurred professional fees of $5,027 and bank fees of $20 in 2013 and bank fees of $60 in 2012.

Respondent disallowed the expenses claimed on petitioners' Schedules C as trade or business deductions and allowed certain expenses as deductions on Schedules A, Itemized Deductions, and increased investment expenses and investment miscellaneous expenses subject to the 2% adjusted gross income (AGI) limitation. For tax year 2013 respondent recharacterized Shoreline's gross receipts of $1,518,535 reported on Schedule C to investment income reported on Schedule A and disallowed Shoreline's COGS deduction of $3,511,168.

B.    West Ahaluna

In 2004 petitioner husband formed West Ahaluna as a single-member LLC. Through multiple acquisitions in 2004 West Ahaluna acquired approximately 176 acres of undeveloped land in Gainesville, Hall County, Georgia. West Ahaluna's land is mostly contiguous and located on or around Dawsonville Highway and the shoreline of Lake Lanier. AHP and BC LLC acquired land in the same area as West Ahaluna.

[*8]   Petitioner husband intended to use most of West Ahaluna's land to develop a residential community on the shoreline of Lake Lanier (residential component). He planned to develop commercial and retail space on the portion of land that abutted Dawsonville Highway (commercial component).  Petitioner husband hired a firm to design a plan for development, and the first plan was finalized in April 2007.

For the residential component petitioner husband's activities included engaging a land surveyor to prepare design plans, applying for and receiving boat dock permits, and extending the permits from 2012 through 2016 after they expired in 2011.  The residential component did not progress past the planning stages.

After development of the residential component stalled, petitioner husband focused on the commercial component.  Around 2008 petitioner husband was introduced to a representative of Sembler Co. (Sembler), a Florida-based company specializing in retail development.  Petitioner husband proposed to sell the commercial component's land to Sembler.  Sembler and petitioner husband entered into a contract for Sembler to purchase 100 acres for $600,000 an acre.  In early 2009 Sembler was in the process of assembling tenants, including a national supermarket chain and several national retail outlets.  Sembler had $500,000 of

[*9] earnest money in escrow and had spent more than $350,000 in surveys, soil testing, and concept plans. Sembler had pulled out of the deal by late 2009 because of financial conditions in the real estate market. The commercial component was not physically altered or improved.

Petitioner husband purchased portions of West Ahaluna's land financed with loans from Colonial Bank (Colonial),[3] and Colonial required ongoing appraisals of West Ahaluna's land. A January 2012 appraisal noted that the economic conditions restricted the development of West Ahaluna's land for three to five years because of an insufficient demand in the real estate market. The appraisal concluded that the highest and best use of the land was investment holding for low- to medium-density residential use.

After the appraisal petitioner husband placed West Ahaluna's land in a 10-year conservation program in 2012. West Ahaluna was subject to a $245,287 penalty if the land was removed from the conservation program before the 10-year period expired. After the tax years at issue petitioner husband applied for and obtained rezoning and annexation into the City of Gainesville, Georgia, for 127.55

---

[3]Colonial closed in 2009, and its assets were transferred to Branch Banking & Trust Co. For simplicity we will refer to Branch Banking & Trust Co. as Colonial for the years after 2009.

[*10] acres, which constitutes West Ahaluna's residential component. At the time of trial the residential component was under a sales contract.

West Ahaluna reported no income during the tax years at issue. Petitioners deducted West Ahaluna's expenses on their Schedules C as follows:

| Expense | 2012 | 2013 |
|---|---|---|
| Mortgage interest | $209,150 | $202,738 |
| Other interest | 18,339 | 17,596 |
| Real estate taxes | 16,564 | 21,658 |
| Insurance | 3,302 | --- |
| Other expenses: Amortization | 14,942 | 22,413 |

Respondent disallowed these expenses claimed on Schedules C as trade or business deductions. In separate adjustments respondent moved the expenses to Schedules A and increased investment expenses and investment miscellaneous expenses subject to the 2% AGI limitation.

## C. BC LLC

In 2004 petitioner husband formed BC LLC as a single-member LLC. From 2004 to 2006 BC LLC acquired approximately 83 acres of improved and unimproved land. The improved portion included residential homes and one warehouse.

[*11] In 2008 petitioner husband engaged a land developer to prepare design plans for 38.5 acres of BC LLC's property for residential development. In 2013 petitioner husband submitted an application to have the 38.5 acres rezoned and annexed into the City of Flowery Branch, Georgia. The application was approved in 2014. Petitioner husband did not perform any further development activities for the 38.5 acres.

Petitioner husband purchased the warehouse property in 2005. The property was purchased subject to a preexisting loan from Quantum National Bank (Quantum). Petitioner husband refinanced the loan in 2007, and in a memorandum prepared for Quantum's refinance committee, BC LLC was listed as being in the investment real estate business. In 2013 petitioner husband renewed his loan with Quantum. Quantum noted in a memorandum in support of the loan that the property was investment property.

Petitioners reported rental income from BC LLC of $6,400 and $5,500 on their 2012 and 2013 Schedules E, Supplemental Income and Loss, respectively. Petitioners deducted the following expenses for BC LLC on their 2012 and 2013 Schedules E.

[*12]

| Expense | 2012 | 2013 |
|---|---|---|
| Advertising | $85 | --- |
| Mortgage interest | 125,587 | $94,457 |
| Depreciation | 90,770 | 90,769 |
| Bank fees | 40 | 5,288 |
| Taxes | 59,456 | 31,744 |
| Check reorder fees | --- | 252 |

Respondent disallowed BC LLC's income and expenses reported on petitioners' Schedules E.  In separate adjustments respondent recharacterized BC LLC's income as investment income and allowed its expenses as investment expenses.[4]

D.    Lumpkin

Petitioner husband formed Lumpkin in 2005 as a single-member LLC. Lumpkin purchased approximately 353 acres in Dawson County, Georgia, with a $10,608,555 loan from Colonial.  The acquired land consisted of timberland and was subject to a conservation use easement.  In 2007 Lumpkin purchased

---

[4]Petitioners conceded that BC LCC's activities should not be reported as a rental real estate business and contend that BC LLC's expenses should be allowed on Schedule C.

[*13] approximately 37 additional acres in Dawson County for $983,136. The sellers of the 37 acres financed the purchase.

Lumpkin also owned land in Hall County, including two rental properties. The first rental property had a mobile home that was subject to a lease dated May 16, 2011. The other rental property accommodated 15 mobile homes, and two of the mobile homes were leased from February 1, 2011 to 2012.

Petitioner husband had two different design plans prepared in 2008 for Lumpkin's land in Dawson County, but he made no further efforts to develop the land. Colonial noted in a 2011 appraisal that development was not financially feasible. Colonial's 2012 appraisal concluded the best use of the property was "investment holding until the market improves".

Petitioners reported rental income from Lumpkin of $10,260 and $11,006 on their 2012 and 2013 Schedules E, respectively. In addition, petitioners reported the following expenses for Lumpkin on their Schedules E.

[*14]

| Expense | 2012 | 2013 |
|---|---|---|
| Mortgage interest | $468,406 | $452,227 |
| Other interest | 52,653 | 32,157 |
| Taxes | 92,429 | 3,614 |
| Depreciation | 2,545 | 2,545 |
| Bank fees | 1,298 | 2,530 |
| Amortization | --- | 1,925 |

Respondent disallowed Lumpkin's income and expenses reported on Schedules E.[5]  In separate adjustments respondent included Lumpkin's income as investment income and moved Lumpkin's expenses to Schedule A as investment expenses and investment miscellaneous expenses subject to the 2% AGI limitation.

III.   Gainesville Market

Gainesville Market owned three contiguous lots in Gainesville.  The first two lots were purchased in 2001 for $2,475,000, financed by the seller.  The third lot was purchased in 2003 for $275,000.  The three lots make up a strip mall and surrounding parking areas.  The strip mall's tenant mix includes a large Catholic

---

[5]Petitioners conceded that Lumpkin's activities should not be reported as a rental real estate business and contend that Lumpkin's expenses should be allowed on Schedule C.

[*15] church, startup churches, and small businesses.  Since Gainesville Market acquired the strip mall, it has struggled with low occupancy rates.

Gainesville Market has no employees nor an on-site property manager.  AHP's employees performed administrative duties such as bookkeeping and payments of expenses.  Keith Brown, an employee of AHP, handled all tenant issues, coordinated with repairmen, showed prospective tenants retail space, and signed leases.  Gainesville Market paid management fees to AHP for Mr. Brown's services.

Petitioner husband performed some activities pertaining to Gainesville Market.  He reviewed approximately 8 different expenses per month during 2012, and about 9 to 10 different expenses per month during 2013.  Half of the monthly expenses were for recurring payments, i.e., utilities, property taxes, and loan payments.  Petitioner husband also approved leases for prospective tenants.  The leases were usually at set prices and did not involve price negotiations.

Gainesville Market reported losses on Schedules E for tax years 2012 and 2013 of $179,566 and $128,977, respectively.  Respondent disallowed the loss deductions for Gainesville Market pursuant to passive activity loss rules under section 469.

**[*16]** IV.    Other Business Activities of Petitioner Husband

In addition to owning AHP and the Conner LLCs, petitioner husband served as the director, CEO, CFO, secretary, or registered agent for the following entities: (1) 68 SOQUE, LLC; (2) Beachwood Crossing Property Owners Association, Inc.; (3) Christworld, Inc.; (4) Gainesville Pilot Services, Inc.; (5) Hamilton Drive Office Condominium Owners Association, Inc.; (6) Holiday Homes Financial Corp.; (7) Holiday Homes, Inc.; (8) Home & Jobs Worldwide, Inc.; (9) Home Place Holdings 2011, LLC; (10) Lake 53, LLC; (11) SOQUE, LLC; (12) Southeastern Grading Company; (13) The Home Place Mortgage Co., Inc.; and (14) Vision Homes, Inc.  He also performed duties for other entities during the years at issue including American Home Builders, Inc., Gainesville Auto Sales, LLC, Gainesville Pilot Services, Inc., and Home Air, Inc.

V.    Loss From AHP

Petitioner husband's 2013 Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc., from AHP reported a section 1231 loss of $747,010. Petitioners reported the loss on Form 4797, Sales of Business Property, attached to their 2013 income tax return.  The loss was reported for depreciable business assets of AHP.  Respondent disallowed the loss deduction.

[*17] VI.    Net Operating Loss (NOL)

On their 2012 income tax return petitioners carried forward a total combined NOL consisting of a net loss of $581,741 for tax year 2011 and a net loss of $26,001 for tax year 2009.  Respondent disallowed the 2011 NOL deduction because of passive activity loss limitations.  In October 2014 petitioners filed a petition with this Court for redetermination of deficiencies that respondent determined for tax years 2010 and 2011.  In November 2015 the parties filed a stipulated decision which provided that there was no deficiency for tax year 2011.

VII.    Charitable Contribution Deduction

In 2013 AHP made a noncash charitable contribution in the form of a land sale to Lanier Hills Baptist Church, Inc.  AHP sold the land to the church for $1,020,000.  The appraised value of the property was $1,540,000.  AHP's adjusted basis was $1,127,790.  AHP reported a contribution of $520,000.  Petitioners reported the $520,000 contribution on their 2013 income tax return.  They treated the property as investment property and as a long-term capital asset and therefore did not limit the reported amount of the contribution to basis pursuant to section 170(e).

Petitioners did not deduct any amount of the reported contribution because they claimed an overall loss for tax year 2013.  After respondent's adjustments to

[*18] petitioners' 2013 income, the contribution was no longer limited fully. Respondent allowed a charitable contribution deduction of $380,812 pursuant to the limitation of section 170(e).

VIII. Preparation of Tax Returns

Petitioners do not have any expertise or background in tax. Starting in 2010 and for the tax years at issue they engaged Brady Ware, a public accounting firm, to prepare their income tax returns and to provide a certified financial audit for AHP. Brady Ware had several clients in the real estate industry, including homebuilders. Brady Ware also prepared AHP's Form 1120-S, U.S. Income Tax Return for an S Corporation.

Thomas Marsh was the partner in charge of preparing petitioners' returns. He assigned four certified public accountants (C.P.A.s) to prepare petitioners' and AHP's income tax returns. Mr. Marsh has been a public accountant for over 34 years and represented real estate professionals. He has prepared both individual and corporate tax returns.

Petitioners provided Mr. Marsh with all the necessary information and documentation needed to file their returns. For the AHP returns its employees compiled all relevant information and submitted it to Brady Ware. Mr. Marsh

**[*19]** relied upon the information AHP's employees and petitioners provided him to prepare its income tax returns.

Mr. Marsh concluded petitioner husband was a real estate professional. He further concluded that petitioner husband materially participated in the activities of Gainesville Market, BC LLC, and Lumpkin and that these LLCs' activities should be reported on Schedules E. He concluded that West Ahaluna and Shoreline should be reported on Schedules C.

Mr. Marsh was in frequent contact with petitioner husband, including visits to his office. He was aware that no dirt had been moved on any of the land the Conner LLCs owned. Mr. Marsh was aware petitioner husband had not physically developed or excavated any of the land BC LLC, Lumpkin, Shoreline or West Ahaluna held during the tax years at issue.

OPINION

I.    <u>Burden of Proof</u>

Generally, the taxpayer bears the burden of proving the Commissioner's determinations are erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner if the taxpayer establishes that he or she complied with the requirements of section 7491(a)(2)(A)

[*20] and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests. Sec. 7491(a).

Petitioners contend that they meet the requirements of section 7491(a) to shift the burden of proof to respondent. Conversely, respondent contends the burden has not shifted because petitioners failed to introduce credible evidence necessary for the burden to shift. The resolution of these issues does not depend on which party has the burden of proof. We resolve these issues on the preponderance of evidence in the record. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

II.     Capital Loss From the Sale of Shoreline Property

Shoreline sold all of its property in a single sale at a loss in taxable year 2013. Petitioners contend that the character of the loss is ordinary because Shoreline held its land in the ordinary course of business. Respondent contends that the character of the loss is capital because Shoreline held its land for investment.

Section 1221(a)(1) defines a capital asset as "property held by the taxpayer * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". To determine whether a real estate asset is a capital asset the Court analyzes the facts and circumstances,

[*21] including factors such as the "number, extent, continuity and substantiality of the sales * * * [and] the extent of subdividing, developing, and advertising". United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969). No specific factor or combination of factors is controlling. Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976).

The Court of Appeals for the Eleventh Circuit, to which this case is appealable,[6] concluded that "frequency and substantiality of sales are highly probative on the issue of holding purpose because the presence of frequent sales ordinarily belies the contention that property is being held for 'investment' rather than for 'sale.'" Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980). Shoreline had a single sale over the course of eight years. A single sale stands in contrast to cases where the taxpayer held land in the ordinary course of business. Id. at 181 (at least 244 sales over 33 years); Boree v. Commissioner, T.C. Memo. 2014-85, at *3 (about 60 sales over five years), aff'd in part and rev'd

_____

[6]We follow the relevant precedent of the Court of Appeals to which an appeal would lie. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Eleventh Circuit has adopted as binding decisions of the former Court of Appeals for the Fifth Circuit handed down on or before September 20, 1981. See Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981); see also Boree v. Commissioner, 837 F. 3d 1093 (11th Cir 2016), aff'g in part and rev'g in part on other grounds T.C. Memo. 2014-85).

**[*22]** <u>in part on other grounds</u> 837 F.3d 1093 (11th Cir. 2016); <u>Garrison v. Commissioner</u>, T.C. Memo. 2010-261, slip op. at 10 (at least 15 sales over three years).

Petitioner husband made no effort to sell Shoreline's property during the tax years at issue or during any of the preceding years. Petitioner husband never advertised Shoreline's property, listed Shoreline's property with brokers, maintained a sales office, or employed a sales force. The sale occurred after a third party made an unsolicited offer to petitioner husband.

Shoreline held its property for multiple years without engaging in development-related activities. From 2005 to 2007 petitioner husband secured permits and prepared design plans. However, from 2007 to 2013 petitioner husband did nothing to further the development of Shoreline's property. The length of time that Shoreline's property sat idle supports capital loss treatment. <u>See</u> <u>Boree v. Commissioner</u>, 837 F.3d at 1103.

All the evidence supports the isolated nature of the transaction rather than an ongoing real estate business. Shoreline's expenses consisted of holding costs, such as mortgage interest and property taxes. In 2013 petitioner husband placed Shoreline's land in a conservation program which prohibited development of

**[*23]** Shoreline's property.  Accordingly, petitioners incurred a capital loss from the Shoreline transaction.

III.    Expenses for Conner LLCs

Deductions are a matter of legislative grace, and a taxpayer must prove his or her entitlement to a deduction.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Sections 162 and 212 allow a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business or for the production of income.  See secs. 162(a), 212.  Miscellaneous deductions under section 162 are subject to the 2% floor in section 67(a).

Section 162 allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  An ordinary expense is one that commonly or frequently occurs in the taxpayer's business, Deputy v. du Pont, 308 U.S. 488, 495 (1940), and a necessary expense is one that is appropriate and helpful in carrying on the taxpayer's business, Welch v. Helvering, 290 U.S. at 113.  The expense must directly connect with or pertain to the taxpayer's business.  Sec. 1.162-1(a), Income Tax Regs.

Section 212 provides, in relevant part, that an individual taxpayer can deduct all the ordinary and necessary expenses paid or incurred (1) for the

[*24] production or collection of income or (2) for the management, conservation, or maintenance of property held for the production of income. Sec. 212(1) and (2). Section 212 applies to income-producing activities that are not a trade or business. Woodward v. Commissioner, 397 U.S. 572, 575 n.3 (1970); United States v. Gilmore, 372 U.S. 39, 44-45 (1963).

In general section 163(a) allows a deduction for all interest paid or accrued within the taxable year on indebtedness. There is an exception to this general rule. Section 163(h)(1) provides that in the case of a taxpayer other than a corporation, no deduction shall be allowed for personal interest which is paid or accrued during the tax year. Personal interest does not include interest allocable to a trade or business, or investment interest. Sec. 163(h)(2). The amount allowed as a deduction for investment interest for any tax year shall not exceed the net investment income of the taxpayer for the taxable year. Sec. 163(d)(1).

Petitioners contend that the expenses of the Conner LLCs are deductible under section 162 as trade or business expenses. Respondent contends that the expenses of the Conner LLCs are not deductible under section 162 but are deductible investment expenses under section 212 and subject to the limitations of section 163(d)(1).

**[*25]** Petitioners contend that all the activities of the Conner LLCs and of AHP constitute a single activity for purposes of section 162. Petitioners further contend that all the land the Conner LLCs held was for development and that the Great Recession delayed development. Respondent argues that the LLCs are separate and distinct entities for purposes of section 162. We address each of the parties' arguments below and conclude that, under either approach, petitioners' deductions are limited under sections 212 and 163(d)(1).

Activity relating to undeveloped real property is subject to a facts and circumstances test to determine whether the taxpayer-owner engaged in a trade or business under section 162. Polakis v. Commissioner, 91 T.C. 660, 669-670 (1988). It is not a trade or business where development activities are in the exploratory or formative stages. Christian v. Commissioner, T.C. Memo. 1995-12. Among the tests that the courts have come to rely on in determining the nature of the taxpayer's activities with respect to real estate are the following:

> the nature and purpose of the acquisition of the property and the duration of the ownership; the continuity of sales or sales-related activity over a period of time; the volume and frequency of sales; the extent to which the taxpayer or his agents have engaged in sales activities by developing or improving the property, soliciting customers, and advertising; and the substantiality of sales when compared to other sources of taxpayer's income.

Polakis v. Commissioner, 91 T.C. at 670.

**[*26]** A.    Conner LLCs Individually

      1.    Shoreline

Petitioner husband did not advertise Shoreline property or attempt to attract customers.  Shoreline never subdivided, graded, or improved its land.  Its property remained in the condition it was in on the date of purchase.  See Christian v. Commissioner T.C. Memo. 1995-12.

Shoreline had only one sale and that was for the property in its entirety. Shoreline's sales activity was neither regular nor continuous for purposes of section 162.  See Polakis v. Commissioner, 91 T.C. at 670-672.  Its expenses during the years at issue consisted of holding costs.  Petitioner husband placed Shoreline's land in a conservation program in 2013 to reduce property taxes.  The conservation program prohibited development.  Placing land in a conservation program is consistent with an intent of an investor to reduce the property's carrying cost while waiting for capital appreciation.  Id. at 672.

We conclude that Shoreline's property was held for investment during the tax years at issue.  See id. at 670-672.  Accordingly, petitioners cannot deduct Shoreline's expenses under section 162, and Shoreline's expenses are deductible subject to sections 212 and 163(d)(1).

**[*27]**       2.       <u>West Ahaluna</u>

West Ahaluna's development never progressed past the exploratory or formative stage.  Petitioner husband had design plans prepared and secured boat slip permits for West Ahaluna's property.  However, he never executed these plans, and West Ahaluna's property remained undeveloped during the years at issue.  West Ahaluna never subdivided, graded, or otherwise improved its properties.

No sales were ever made.  Petitioner husband made no effort to sell West Ahaluna's property during the tax years at issue.  Although he attempted to sell a portion of West Ahaluna's property to Sembler in 2009, the sale was ultimately unsuccessful.  By 2013 West Ahaluna had held its property for approximately nine years.

West Ahaluna did not incur day-to-day operating expenses.  Its expenses consisted of holding costs, such as mortgage interest and property taxes.  An appraisal concluded that the best use of the land was holding for investment.  To reduce holding costs, petitioner husband placed West Ahaluna's property in a 10-year conservation program in 2012, which further demonstrates that West Ahaluna held land for investment.  <u>See</u> <u>Polakis v. Commissioner</u>, 91 T.C. at 672.

**[\*28]** We conclude that West Ahaluna's property was held for investment during the tax years at issue. See id. at 670-672. Accordingly, petitioners cannot deduct West Ahaluna's expenses under section 162, and its expenses are deductible subject to sections 212 and 163(d)(1).

3. BC LLC

BC LLC held multiple properties but did not subdivide, grade, or otherwise prepare them for resale. Petitioner husband prepared preliminary development plans for a portion of BC LLC's property. Petitioner husband never executed the plans, and the development stalled in the exploratory or formative stage. He did not prepare development plans for most of BC LLC's property. Bank documents list property held by BC LLC as investment property.

In 2014 BC LLC had a portion of its property rezoned and annexed into the City of Flowery Branch. The rezoning and annexation occurred after the tax years at issue. BC LLC made no sales, and petitioner husband made no effort to sell BC LLC property during the tax years at issue. Its expenses consisted of holding costs, such as mortgage interest and property taxes.

We conclude that BC LLC's property was held for investment. See Polakis v. Commissioner, 91 T.C. at 670-672. Accordingly, petitioners cannot deduct BC

[*29] LLC's expenses under section 162, and its expenses are deductible subject to sections 212 and 163(d)(1).

### 4. Lumpkin

In 2008 petitioner husband engaged a land surveyor to prepare preliminary development plans for a portion of Lumpkin's property. Petitioner husband never subdivided or otherwise improved Lumpkin's property.

Lumpkin did not incur day-to-day development expenses. Its expenses consisted entirely of holding costs, such as mortgage interest and property taxes. Lumpkin never made any sales and petitioner husband never attempted to sell Lumpkin's property during the years at issue. A 2012 appraisal concluded the best use of the land was holding for investment.

We conclude that Lumpkin's property was held for investment. See Polakis v. Commissioner, 91 T.C. at 670-672. Accordingly, petitioners cannot deduct Lumpkin's expenses under section 162, and its expenses are deductible subject to sections 212 and 163(d)(1).

### B. Conner LLCs Combined

Petitioners contend that the Conner LLCs constitute a single development business and that its development activities rise to the level of an active trade or business for purposes of section 162. They contend that all the land was to be

**[*30]** developed as part of a master plan. The total sales during the tax years at issue demonstrate that the Conner LLCs held property for investment. See Suburban Realty Co., 615 F.2d at 18. Petitioner husband sold one parcel of real estate during the years at issue (i.e., the Shoreline sale). Petitioner husband made no effort to sell any of the Conner LLCs' property during the years at issue. He never advertised the properties or listed them for sale.

The lack of development of the properties indicates that the Conner LLCs held land for investment. Petitioner husband never subdivided or otherwise improved any property. The development of each property stalled in the planning stage, and petitioner husband never executed any development plan. Each property remained in the condition it was in on the date of purchase. Carrying on a trade or business requires more than just preliminary planning and permitting. Christian v. Commissioner, T.C. Memo. 1995-12.

None of the Conner LLCs incurred day-to-day operating expenses related to an ongoing development business. The Conner LLCs incurred costs related to holding property for investment. To reduce holding costs petitioner husband placed portions of Shoreline and West Ahaluna property in conservation programs, actions indicative of holding land for investment. See Polakis v.

[*31] <u>Commissioner</u>, 91 T.C. at 672. Bank appraisals treated the land as being held for investment.

Petitioners argue that the activities of AHP, the Conner LLCs, and petitioner husband, in his individual capacity, constitute a single integrated real estate business. However, "[t]he determination of whether an entity is actively engaged in a trade or business must be made by viewing the entity in a standalone capacity and not in conjunction with other entities." <u>Broz v. Commissioner</u>, 137 T.C. 46, 65 (2011), <u>aff'd</u> 727 F.3d 621 (6th Cir. 2013). AHP is an S corporation, and therefore it is a separate entity for tax purposes. <u>See</u> <u>id.</u> (finding that the activities of a taxpayer's wholly owned S corporation could not be attributed to the taxpayer's wholly owned LLC, which was a disregarded entity). We will not attribute AHP's real estate activities to the Conner LLCs or to petitioner husband.

The activities of the Conner LLCs, as grouped together, are not a trade or business. Petitioners cannot claim expenses for these entities as deductions under section 162. Petitioners' expense deductions for the Conner LLCs are subject to the limitations of sections 212 and 163(d)(1).

IV.    <u>Section 469 Passive Activity Loss Limitations</u>

Taxpayers are allowed deductions for certain business and investment expenses under sections 162 and 212. However, if the taxpayer is an individual,

**[\*32]** section 469 generally disallows any passive activity loss for the taxable year and treats it as a deduction allocable to the same activity for the next taxable year. Sec. 469(a) and (b). A passive activity loss is defined as the excess of the aggregate losses from all passive activities for the taxable year over the aggregate income from all passive activities for that year. Sec. 469(d)(1).

A passive activity is any trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). A trade or business includes any activity for which expenses are allowable as a deduction under section section 212. Sec. 469(c)(6)(B). A taxpayer is treated as materially participating in an activity only if his or her involvement in the operations of the activity is regular, continuous, and substantial. Sec. 469(h)(1). Rental activity is generally treated as a per se passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2).

Section 469(c)(7) provides an exception to the rule that a rental activity is per se passive. The rental activities of a taxpayer in a real property trade or business who meets certain designated requirements (a real estate professional) are not subject to the per se rule of section 469(c)(2). Sec. 469(c)(7)(A); see Kosonen v. Commissioner, T.C. Memo. 2000-107, slip op. at 9; sec. 1.469-9(b)(6), (c)(1), Income Tax Regs. Rather, the rental activities of a real estate professional are

**[*33]** subject to the material participation requirements of section 469(c)(1).  <u>See</u>

sec. 1.469-9(e)(1), Income Tax Regs.

A taxpayer qualifies as a real estate professional if:  (1) more than one-half

of the personal services performed in trades and businesses by the taxpayer during

the taxable year are performed in real property trades or businesses in which the

taxpayer materially participates, and (2) the taxpayer performs more than 750

hours of services during the taxable year in real property trades or businesses in

which the taxpayer materially participates.  Sec. 469(c)(7)(B)(i) and (ii).  Mere

financing of or investing in real property is not included in the definition of "real

property trade or business".  <u>See</u> sec. 469(c)(7)(C); <u>see also</u> <u>Coastal Heart Med.</u>

<u>Grp., Inc. v. Commissioner</u>, T.C. Memo. 2015-84.  In the case of a joint return, the

above requirements are satisfied if either spouse separately satisfies these

requirements.  Sec. 469(c)(7)(B).

For the purposes of determining whether a taxpayer is a real estate

professional, a taxpayer's material participation is considered separately with

respect to each rental property, unless the taxpayer makes an election to treat all

interests in rental real estate as a single rental real estate activity.  Sec.

469(c)(7)(A); sec. 1.469-9(e)(1), Income Tax Regs.  A taxpayer makes the election

**[*34]** by "filing a statement with the taxpayer's original income tax return for the taxable year." Sec. 1.469-9(g)(3), Income Tax Regs.

Petitioners filed a statement with their 2013 income tax return electing to treat all of their interests in rental real estate as a single rental real estate activity. Since petitioners concede that BC LLC and Lumpkin were not real estate activities during the tax years at issue, there is only one rental property and the election does not apply.

A.     Material Participation in Gainesville Market

Petitioners contend that petitioner husband was a real estate professional. First we must determine whether petitioner husband participated in a real property trade or business. "Real property trade or business" means "any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing, or brokerage trade or business." Sec. 469(c)(7)(C). Petitioner husband participated in the operations of Gainesville Market, which is a rental business.

Second, we must determine whether petitioner husband materially participated in the business of Gainesville Market. A taxpayer is considered to have materially participated in a particular rental trade or business if one of seven tests set forth in the regulations is met. Sec. 1.469-5T(a), Temporary Income Tax

**[*35]** Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988); sec. 1.469-9(b)(5), Income Tax Regs.  Petitioners argue that petitioner husband satisfied the following tests from section 1.469-5T(a)(2), (3), (5), (7), Temporary Income Tax Regs., <u>supra</u>:

>      (2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

>      (3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

>                *    *    *    *    *    *    *

>      (5) The individual materially participated in the activity (determined without regard to this paragraph (a)(5), for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

>                *    *    *    *    *    *    *

>      (7) Based on all of the facts and circumstances * * * the individual participates in the activity on a regular, continuous, and substantial basis during such year.

A taxpayer may establish hours of participation by any reasonable means. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).  Contemporaneous daily reports are not required if the taxpayer can establish participation by other reasonable means.  <u>Id.</u>  Reasonable means include

[*36] "appointment books, calendars, or narrative summaries" that identify the services performed and "the approximate number of hours spent performing such services". Id. We have noted previously that we are not required to accept a postevent "ballpark guesstimate" or the unverified, undocumented testimony of taxpayers. See, e.g., Moss v. Commissioner, 135 T.C. 365, 369 (2010); Lum v. Commissioner, T.C. Memo. 2012-103; Estate of Stangeland v. Commissioner, T.C. Memo. 2010-185.

Petitioners did not provide the exact number of hours that petitioner husband spent on the operations of Gainesville Market during the tax years at issue. Petitioner husband failed to provide contemporaneous time records, such as appointment books, calendars, or time logs. Contemporaneous daily time reports, logs, or similar documents are not required if other reasonable means of establishing a taxpayer's participation exist. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra.

Petitioner husband contends that he spent more time than any other person on the operations of Gainesville Market. He contends that he spent more than 100 hours each year and that no individual performed more work than he did for Gainesville Market. Mr. Brown handled the day-to-day operations of Gainesville Market, such as dealing with tenants and repairmen. Tenants testified that Mr.

[*37] Brown was the property manager because he was their contact. Other AHP employees performed administrative duties for Gainesville Market, such as bookkeeping and collecting rent. Without quantification of the work performed by Mr. Brown and the other AHP employees, we cannot determine whether petitioner husband's participation constitutes substantially all of the participation with respect to any particular property. See Shiekh v. Commissioner, T.C. Memo. 2010-126, slip op. at 14 (stating that the taxpayer did not satisfy "substantially all" test where tenants were "responsible for the maintenance of that property"). Therefore, petitioner husband has not satisfied the test under section 1.469-5T(a)(2), Temporary Income Tax Regs., supra.

Petitioners contend that petitioner husband spent more than 100 hours per year on the operations of Gainesville Market. Petitioner husband claimed that he spent time reviewing and approving invoices, making decisions regarding tenant issues, approving and negotiating leases, and renegotiating outstanding loans. Petitioners did not provide sufficient documentation to substantiate the time petitioner husband allocated to these activities.

Gainesville Market incurred few expenses, and half of its expenses were for recurring payments. Petitioner husband testified that the lease terms were non-negotiable. Petitioners also failed to provide specific evidence regarding how

[*38] much time petitioner husband spent on negotiating loans.  Although petitioners provided the loan agreements, they did not provide emails, letters, draft loan agreements or other evidence that establishes the time petitioner husband spent negotiating loans.  Petitioners also provided checks and bills for Gainesville Market.  These records provide no information regarding how many hours petitioner husband spent on a given day on the operations of Gainesville Market.  The records merely reflect a postevent "ballpark guesstimate" which does not meet the requirements of section 1.469-5T(a)(3), Temporary Income Tax Regs., supra.

Petitioner husband contends that his activities for Gainesville Market have been the same for the last 10 years.  Petitioners failed to introduce sufficient evidence to establish petitioner husband's material participation in Gainesville Market for any 5 of the 10 preceding taxable years.  Petitioner husband does not meet the test under section 1.469-5T(a)(3), Temporary Income Tax Regs., supra.

Petitioners contend that petitioner husband materially participated under the facts and circumstances test.  To satisfy the facts and circumstances test under section 1.469-5T(a)(7), Temporary Income Tax Regs., supra, a taxpayer must participate in an activity for more than 100 hours during the taxable year.  Sec. 1.469-5T(b)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25,

**[*39]** 1988). We concluded previously that petitioner husband did not establish that he participated for more than 100 hours in the operations of Gainesville Market.

Even if the 100-hour requirement was met, petitioner husband would not meet the requirements of the facts and circumstances test. A taxpayer's management activities are not taken into account under the facts and circumstances test (1) if another person receives compensation for management services relating to the activity or (2) if another person spends more time on management services relating to the activity of the taxpayer. Sec. 1.469-5T(b)(2)(ii)(A) and (B), Temporary Income Tax Regs., supra. In 2013 Gainesville Market paid AHP for the management services of Mr. Brown, and he participated more than petitioner husband in the operations of Gainesville Market.

We conclude that the evidence shows that petitioner husband did not materially participate in a real estate activity during the tax years at issue for Gainesville Market. For the tax years at issue petitioner husband does not meet the requirement of section 469(c)(7)(B)(ii). Section 469 applies to the deduction of losses with respect to Gainesville Market.

[*40] B.     Material Participation in the Conner LLCs

Petitioners contend that petitioner husband materially participated in the Conner LLCs. They conceded that none of these properties were rental properties. Petitioner husband was the sole member for each Conner LLC. None of the Conner LLCs had employees. Petitioner husband contends that he spent more than 100 hours performing services for each entity each year. Mr. Conner testified that he worked long hours and weekends. Not only did he have the responsibility of AHP, he was involved in numerous other entities.

An employee of AHP had the accounting and bookkeeping responsibilities of the Conner LLCs. Petitioner husband hired a land surveyor to design plans for the properties that the Conner LLCs held. The evidence does not show that petitioner husband participated more than anyone else in the activities of the Conner LLCs. Petitioners failed to provide contemporaneous time records or any other credible evidence to support the time petitioner husband allocated to each Conner LLC. Petitioner husband failed to provide sufficient evidence of material participation in the Conner LLCs for any of the seven tests under section 1.469-5T(a), Temporary Income Tax Regs., supra.

**[\*41]** We conclude the evidence shows that petitioner husband did not materially participate in the activities of the Conner LLCs for the tax years at issue. Section 469 applies to the loss deductions claimed for each of the Conner LLCs.

V.     Net Operating Loss

Section 172 permits a deduction for the full amount of allowable NOL carrybacks from subsequent years and carryovers from previous years, as long as taxable income for the current year is not less than zero. Sec. 172(a),(b)(2). As with all deductions, taxpayers are required to maintain adequate records substantiating a claimed NOL deduction. Sec. 6001; see Keith v. Commissioner, 115 T.C. 605, 621 (2000); Scharringhausen v. Commissioner, T.C. Memo. 2012-350, at \*31-\*32.

In 2011 petitioners sustained an NOL which they carried forward to 2012. The parties previously settled petitioners' deficiency for tax year 2011 in the case at docket No. 23659-14. In that settlement the parties agreed that petitioners had no deficiency for tax year 2011, and the Court entered a stipulated decision. In this case petitioners argue that the doctrine of res judicata precludes respondent from disallowing the 2011 NOL carryforward for tax year 2012.

According to Rule 39 a party shall set forth in the pleadings an affirmative defense, including res judicata. If an affirmative defense is not pleaded, it is

[*42] deemed to be waived.  Jefferson v. Commissioner, 50 T.C. 963, 966-967 (1968). Petitioners did not raise res judicata in their original or amended petition and therefore have waived a res judicata argument.

Even though the res judicata defense is barred, res judicata does not apply in this case because the previous case did not involve the same issues.  Singh v. U.S. Atty. Gen., 561 F.3d 1275, 1280 (11th Cir. 2009).  The settlement did not address whether there was any loss in 2011 that could be carried over.

Respondent contends petitioners did not offer any evidence to support the 2011 NOL carryforward.  Petitioners contend that they have shown that petitioner husband materially participated in rental activities for 2011 and that is enough to substantiate the loss.  Petitioners' evidence does not show the amount of the loss to be carried forward from previous tax years.  We sustain respondent's determination with respect to the NOL carryforward.

VI.   Bargain Sale

The amount of any charitable contribution of property otherwise taken into account for the deduction under section 170(a) must be reduced by the amount of gain that would not have been long-term capital gain (i.e., by the amount of gain that would have been ordinary gain) if the property contributed had been sold by

**[*43]** the taxpayer at its fair market value.  Sec. 170(e)(1)(A); <u>Jones v. Commissioner</u>, 129 T.C. 146, 158 (2007), <u>aff'd</u>, 560 F.3d 1196 (10th Cir. 2009).

In 2013 AHP sold undeveloped land in a bargain sale to Lanier Hills Baptist Church.  Petitioners claimed a charitable contribution deduction for the difference between the sale price and the land's fair market value.  Petitioners contend that AHP held the land for investment.  Respondent contends AHP held the land as an ordinary asset and therefore petitioners' charitable contribution deduction is limited under section 170(e).

Petitioners' contribution is limited to the difference between the sale price and AHP's cost basis if we find that AHP held the land in the ordinary course of business.  <u>See</u> <u>id.</u>  Conversely, petitioners' contribution is the difference between the sale price and the land's fair market value if we find that AHP held the land as a long-term capital asset.  <u>See</u> <u>id.</u>

AHP acquired the land in 2005 and sold it to Lanier Hills Baptist Church in 2013.  AHP held all its land for investment and did not sell land in the ordinary course of business.  <u>See</u> <u>Polakis v. Commissioner</u>, 91 T.C. at 670.  AHP held the land as a long-term capital asset at the time of sale, and therefore section 170(e) does not apply.

[*44] VII.  Losses From AHP

Section 1231 provides rules for the treatment of gains and losses for property used in a trade or business and involuntary conversion.  Petitioner husband's Schedule K-1 from AHP for tax year 2013 shows a net section 1231 loss  of $747,010.  Petitioners contend that the loss is for the disposition of depreciable assets.

Petitioners claimed a loss deduction from AHP of $747,010 for tax year 2013.  AHP closed two sales centers and renovated model homes in 2013. Petitioners contend that these losses pertain to the disposition of depreciable business assets.

Petitioners' C.P.A., Mr. Marsh, testified about the preparation of the Schedule K-1 and AHP's income tax return.  He explained how the amount of the loss was reached and how depreciation schedules were maintained.  The assets AHP disposed of were in sales centers and model homes.  These assets were depreciable property.  We conclude that petitioners are entitled to a deduction for the loss of $747,010.

VIII.  Accuracy-Related Penalties

Respondent determined for each of the tax years in issue that petitioners are liable for an accuracy-related penalty pursuant to section 6662(a).  Respondent

**[\*45]** contends that petitioners are liable for the accuracy-related penalty for each year on alternative grounds: (1) the underpayment is attributable to negligence or disregard of rules or regulations within the meaning of section 6662(b)(1); or (2) it is attributable to a substantial understatement of income tax within the meaning of section 6662(b)(2).

An understatement is substantial if it exceeds the greater of $5,000 or 10% of the income tax required to be shown on the return for the taxable year. Sec. 6662(d)(1)(A). Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

The Commissioner bears the burden of production with respect to this penalty. See sec. 7491(c). Once the Commissioner has met this burden, the taxpayer must provide persuasive evidence that the Commissioner's determination was incorrect. See Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 447 (2001). The section 6662(a) penalty does not apply with respect to any portion of the underpayment for which it is shown that the taxpayer had reasonable cause and acted in good faith. Sec. 6664(c)(1).

**[*46]** Assuming without finding that respondent has met the burden of production for the section 6662 penalty on both alternative grounds, we consider whether petitioners had reasonable cause and acted in good faith.  To determine whether a taxpayer acted with reasonable cause and in good faith all of the pertinent facts and circumstances are taken into account.  Sec. 1.6664-4(b)(1), Income Tax Regs.  For purposes of section 6664(c) a taxpayer may be able to establish reasonable cause and good faith by showing reliance on professional advice.  See id.; see also sec. 1.6664-4(c), Income Tax Regs.  To establish good faith and reasonable cause through reliance on professional advice, the taxpayer must prove by a preponderance of the evidence that "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment".  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

Brady Ware prepared petitioners' 2012 and 2013 income tax returns.  It is a public accounting firm that has clients in the real estate industry.  Brady Ware advised petitioners to report the expenses for Shoreline and West Ahaluna on Schedules C and to report the sale of Shoreline's property as an ordinary loss.  It

**[*47]** also advised petitioners to report the income and expenses of BC LLC and Lumpkin on Schedules E.

Mr. Marsh was in charge of preparing petitioners' income tax returns and AHP's income tax returns. He testified that petitioners were relying upon him to prepare an accurate return and he decided which forms should be used for the reporting of various entities. Mr. Marsh was a competent professional who had sufficient expertise to justify reliance.

Petitioners provided complete and accurate records to Brady Ware and relied on Brady Ware to properly prepare their returns. Mr. Marsh testified that he had all the necessary information to prepare petitioners' income tax returns. Petitioners relied on Brady Ware's advice and took positions on their returns consistent with its advice. Because of the complexity of petitioners' income tax returns and the experience of Mr. Marsh and Brady Ware, it was reasonable for petitioners to rely upon their advice. We find that petitioners are not liable for the accuracy-related penalties under section 6662(a).

We have considered all arguments the parties made, and to the extent we did not mention them above, we conclude they are moot, irrelevant, or without merit.

**[\*48]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.